## ALEXANDER SHIRRAS, JOHN BLACK, WILLIAM MILLIGAN, WILLIAM BLACKLOCK, & JOSEPH VERREES,

*v.*

## JOHN CAIG & ROBERT MITCHEL.

---

*Absent....Washington, justice.*

A mortgage of land, made by one who has a      ERROR to the Circuit Court for the district of Georgia, by Shirras and others original Complainants,

against Caig and Mitchel, original Defendants, in a suit in equity to foreclose a mortgage of a lot, houses, and wharf in Savannah, called Gairdner's wharf, which were in the possession of the Defendants.

The mortgage was made on the 1st of December, 1801, by Edwin Gairdner, in his own name, and also as attorney for the Defendant, Caig, (but without any authority from Caig so to do,) to secure the payment of *l*30,000 sterling, for which E. Gairdner had, on the same day, executed a bond for himself and Caig.

In the year 1796, this property had been purchased by James Gairdner, Edwin Gairdner, and Robert Mitchel as joint tenants, who took a conveyance from Levi Sheftall to themselves, by the description of James Gairdner, Edwin Gairdner and Robert Mitchel, merchants and co-partners of the city of Savannah. The name of the firm was *Gairdners and Mitchel.* In 1799 this firm was dissolved, and the business was carried on in *Charleston* by *Edwin Gairdner alone* under the firm of *Edwin Gairdner and Co.*; and by mutual consent, in December, 1799, an entry was made in the books of Gairdners and Mitchel, by James Gairdner, charging this property, to the account of Edwin Gairdner and Co. at the price of 20,000 dollars. In 1800, Edwin Gairdner entered into partnership, with John Caig, the Defendant, at Savannah, under the firm of Edwin Gairdner and Co.—under which name he continued to carry on business alone at Charleston; and upon his books at that place, made an entry charging this property to the Savannah house (consisting of himself and Caig) at an agreed price; and the Savannah house by an entry on their books credited the same on the account of the Charleston house consisting of Edwin Gairdner alone.

On the 7th of January, 1802, Edwin Gairdner and John Caig dissolved their partnership at Savannah, and a new firm was established consisting of Edwin Gairdner, John Caig and the Defendant, Robert Mitchel, under the name of *Gairdner, Caig and Mitchel,* who by their articles of co-partnership under seal, agreed to take the property in question, at a valuation and hold it as their joint property.

The legal and equitable title to a moiety of the property which the mortgage purports to convey, passes only his legal right, although he had a power, from the person who held the residue of the legal, but not of the equitable estate in the land, to sell and convey his right also; the mortgagor not having affected to convey any part of it under his power from the other person, although his deed purported to mortgage the whole; and the equitable title not being in the person who gave the power. A plat referred to in the deed as being annexed to it, but which was never in fact annexed, and was not recorded with the deed, affords no evidence in aid of the description of the property mentioned in the deed. A person can not be charged

SHIRRAS
& OTHERS
*v.*
CAIG &
MITCHEL.

with fraudulently secreting a deed who places it upon record as soon as the law requires.

It is not necessary to the validity of a mortgage that it should truly state the debt it is intended to secure; but it shall stand as a security for the real equitable claims of the, mortgagees, whether they existed at the date of the mortgage, or arose afterwards upon the faith of the mortgage, before notice of the Defendants equity.

Previous to this, viz. in March, 1800, Mitchel had by deed conveyed his third part of this property to Edwin Gairdner and John Caig, as joint tenants; and at the time of executing the mortgage (viz. December 1, 1801) Edwin Gairdner had full power and authority from James Gairdner to sell and convey his share of the property.

Subsequent to the mortgage, viz. on the 27th of July, 1802, Edwin Gairdner, as attorney for James Gairdner, by deed conveyed to Mitchel one third of the property, and by his own deed of the same date, he conveyed one sixth of the property to Caig, who had before received a conveyance of one other sixth from Mitchell.

These two last deeds were proved and recorded on the 14th of September, 1802.

The mortgage was proved on the 10th, and recorded on the 17th of September, 1802.

By the law of Georgia, deeds of bargain and sale are to be recorded in 12 months—and by a law of 1768, every mortgage and deed recorded within ten days after it's execution, shall have preference of other deeds and mortgages, not recorded within that period.

At the time of executing the mortgage, therefore, the legal title of three sixths of the property was in Edwin Gairdner, and according to the book entries of the several co-partnerships he was also equitably entitled to the same. The legal title of two sixths was in James Gairdner, and of the other sixth in Caig, who, according to the book entries was equitably entitled to three sixths; so that although Edwin Gairdner had a legal power to sell and transfer James Gairdner's two sixths, yet he was bound in equity to transfer them to Caig.

The complainants in their bill claim the whole. They state that Edwin Gairdner was the real bona fide owner of the property—that the book entries were made only to give a credit to the Savannah house, and were without consideration—that the Savannah house was only to hold it in trust for Edwin Gairdner during the co-partnership. That Edwin Gairdner became bankrupt on the 3d of November, 1802, has received his certificate of discharge

and that two of the complainants, Blacklock and Verrees, were duly appointed his assignees. That Caig and Mitchel, and the firm in which they are partners, are still largely indebted to Edwin Gairdner, who is also very largely indebted to the Complainants. And they pray that all conveyances, under which Caig and Mitchel claim to hold possession of the property, may be declared void and may be cancelled—that the property may be sold and the proceeds applied towards payment of the debts due to the Complainants—and for general relief.

SHIRRAS & OTHERS *v.* CAIG & MITCHEL.

The answers of Caig and Mitchell, the Defendants, do not admit that any thing was due by E. Gairdner to the Complainants on the 1st of December, 1801, the date of the mortgage, and suggest that if any thing was due it has since been paid off or otherwise settled. That Caig was made a party to the bond and mortgage without his authority and consent. That the bond and mortgage were carefully kept secret until the 13th of September, 1802. That it was not a regular transaction and ought not to avail against the Defendants, who are bona fide purchasers.

They set forth the several co-partnerships and entries in the books and aver that they and all the parties considered them as good transfers of the property which was always holden and considered as stock in trade. They deny all private, secret, or confidential trust for the benefit of E. Gairdner. They aver, that they believe, that at the date of the mortgage the Charleston house was indebted to the Savannah house, after allowing credit for the property in question.

In this state of the cause, the Defendants, Caig and Mitchel, filed a cross bill against the Complainants, Shirras and others, alleging secret transactions between them and E. Gairdner, and praying a discovery. They charge that the execution of the bond and mortage was an act of hurry and despair, in the confusion and embarrassment of entangled circumstances, and at the eve of one of the greatest and most distressing bankruptcies. That the deeds were not signed until some weeks or months after their date. That no title papers were shown to the mortgagees, [they being all in the hands

SHIRRAS & OTHERS v. CAIG & MITCHEL.

of Caig at Savannah] nor any authority from Caig to convey his interest. That the mortgage was taken without reflection or previous contemplation as to the security intended to be given, but as the last hope of saving or securing something from a person on the eve of insolvency. That the bond and mortgage were not executed for advances made, or money lent on the security, or hope of security arising from the mortgage, but with the intent to indemnify the mortgagees for endorsements at the banks in South Carolina for E. Gairdner, and for other collateral securities entered into for him; all which were settled and discharged by the exertions of E. Gairdner, and the resources he was then enabled to bring into activity. That there is no money due on the bond, or on the consideration for which the bond was given. That all the obligees have been fully paid, satisfied and indemnified, without having recourse to the mortgaged premises, and that the mortgage is kept up for speculating purposes, and to oppress Caig and Mitchel, or to cover some transaction between E. Gairdner and one of the obligees, subsequent to the execution of the mortgage and which has no relation to the same. That the mortgage was concealed from Caig and Mitchel for fear of injuring E. Gairdner's credit, and was not delivered to the mortgagees till some time before it was recorded; and was not recorded until Caig and Mitchel had paid a valuable consideration for two-thirds of the property and were in the quiet possession thereof, with the knowledge of the mortgagees. They claim title to two-thirds of the property under the various book entries of the several firms.

The bill then seeks a discovery of the day, and consideration on which the bond and mortgage were really executed; and whether the mortgagees had not notice of the claim of Caig and Mitchel. Whether the mortgagees gave notice of the mortgage to them, and requires Shirras and others to disclose the real debts, together with the particulars thereof, actually due from E Gairdner, to each of them, at the date of the mortgage. It prays that the mortgage may be decreed to be fraudulent and void as to Caig and Mitchel, and for general relief.

The separate answers of the several Defendants, Shirras and others, to the cross bill, set forth minuetely

their several claims against E. Gairdner, and aver that the monies loaned and responsibilities incurred were upon the faith of the mortgage—except Wm. Blacklock, who did not know that he was included in the mortgage till some time after its date. Black in his answer produces on oath the plat referred to in the mortgage, which he says had remained with him ever since the execution of the mortgage.

They all admit that Caig and Mitchel were not notified of the mortgage, and that they knew of no authority from Caig to E. Gairdner to incumber his share of the property. They admit they did not see any title papers, and that they did not require them, having a perfect confidence in the representations and character of Edwin Gairdner. They deny that they had any knowledge of any transfer to Caig and Mitchel, except that E. Gairdner stated that Caig held one sixth. They admit that the mortgage was kept secret until the 10th September, 1802, lest it should injure the credit of the mortgagors. They aver that it was executed on the day of its date or within a very few days afterwards, and was not retained by E. Gairdner, but immediately delivered to the Defendant, Black. The testimony in the cause related merely to the authentication of the instruments; and the entries upon the books, and to the balance of the accounts between the Charleston and the Savannah house, and tending to prove that the Savannah house was considerably indebted to the Charleston house at the date of the mortgage.

In May, 1807, the Circuit Court, consisting of Judges Johnson and Stevens, gave the following *opinion.*

"In the great confusion of legal and equitable interest which exist in this case, the mind can resort to no other means of making a just discrimination, but that of recurring to the original state of the interests of the several parties and following their respective portions through the several changes of property which resulted from subsequent transactions.

By the conveyance from Levi Sheftall to James Gairdner, Edwin Gairdner, and Robert Mitchel, each acquired a fee simple in one third of the property in question.

In legal language they were each seized *per my and* *per tout* of a third part in joint tenancy. The third part of James Gairdner never was legally conveyed, until the deed of July, 1802, by Edwin, attorney for James Gairdner, conveying it to Robert Mitchel. With regard therefore to that third, and the one sixth conveyed by Mitchel and Caig, making up a moiety of the whole, there can be no doubt that the Complainants are not entitled to recover. Both law and equity are on the side of the Defendants. The only difficulties that exist, arise in relation to the one sixth conveyed by Mitchel to Edwin Gairdner and by him conveyed to Caig, and the remaining third originally vested in Edwin Gairdner.

With regard to these propositions the Complainants are in possession of the legal right, and the question is, how far are the Defendants relieved in equity.

It is contended that this Court ought not to aid the Complainants, on several grounds.

1. Because this property ought to be considered as a part of the co-partnership funds of the first firm of Gairdner, Caig and Mitchel, and of E. Gairdner and Co.—and neither co-partner is at liberty to alienate his share until the debts of those concerns are discharged, and their balances adjusted.

2. Because the amounts claimed by the several mortgagees were for loans and assumptions not existing at the time of the mortgage, but incurred afterwards, with a small exception.

3. Because by the articles of co-partnership, the property is legally pledged to the last concern of Gairdner, Caig and Mitchel, and this instrument as well as the conveyance of one sixth to Caig from E. Gairdner, are entitled to a preference to the mortgage, in consequence of the mortgagee's having neglected to record their mortgage, and thereby to put others on their guard.

On the first of these grounds we remark, there are many cases in which real property may be pursued as part of a co-partnership stock, but it is only in the hands of legal representatives in cases of descent, bankruptcy,

&c. but not where a legal alienation has been made, or the property is unaffected by articles of co-partnership.

With regard to the 2d and 3d grounds, we think them of much importance. This Court will certainly support a mortgage when there exists no actual debt, if the mortgagee is under any liability or engagement which may ultimately subject him to loss, or the payment of money for the mortgagor; such, for instance, as the indorsement of notes; the renewal of notes originally indorsed, or an arbitration or administration bond, or other undertaking from which a debt only may be incurred. But it is evident that some bounds ought to be set to this mode of mortgaging on contingencies, especially when the mortgagee retains an absolute unrestrained option, whether the mortgagor shall or shall not be his debtor; when he is under no legal or moral obligation to make loans or assume a liability in his behalf. But as we do not mean to found our decree in this case on this ground, we shall not now attr ıpt to draw the line. The subject is a very delicate one.

On the 3d ground the Court feel themselves compelled to decree in favor of the Defendants.

The Complainants, *by not making known to the world the existence of this mortgage, have lost their right to the aid of this Court in obtaining a foreclosure in their behalf.* The Defendant, Caig, ought not to lose the benefit of the conveyance of the one sixth executed to him by Gairdner. He was legally proprietor of the one sixth, and, by book entries, equitably, of another sixth.

We consider the acknowledgment of interest in him by Gairdner upon the face of the mortgage as sufficient notice, to Complainants, of his interest both legal and *equitable.* This alone would be sufficient to entitle him to the favor of this Court, independently of his having become purchaser afterwards of the *legal* title without notice of the mortgage. With regard to the remaining 3d, we consider the articles of co-partnership, accompanied with the payment of the consideration, as a covenant to stand seized to the use of the firm, and entitled to a precedence to the mortgage *because of the latters not having been recorded.*

SHIRRAS & OTHERS v. CAIG & MITCHEL.

The co-partners, therefore, will be entitled to a prefer-ence as to Gairdners 3d, both as to payment of creditors of the last house of G. C. & M. and for the satisfaction of any demand which the co-partnership may have upon him. Subject to their claims the Complainants will be entitled to relief."

In May 1808, the Circuit Court, made the following final decree.

"The Court, refering to the interlocutory decree of May term 1807, order, adjudge and decree, that the bill be dismissed with costs as against the Defendants, John Caig and Robert Mitchel, as to the two third parts of the mortgaged premises; and that the bill be sustained as to one third of the mortgaged premises, reserving a prefer-ence on the said third part of the premises, both as to the payment of the creditors of the late house of Gairdner, Caig and Mitchel, and for the satisfaction of any demand which the co-partnership may have upon him, said Gaird-ner."

To reverse this decree, the present writ of error was sued out by Shirras and others.

C. LEE, *for Plaintiffs in error.** 

The mortgage ought to avail the mortgagees to the ex-tent of the *nower* and *interest* of the mortgagor.

Edwin Gairdner had the legal estate of three sixths in himself, and had full power and authority from James Gairdner to dispose of, sell and convey the two sixths, whereof the legal estate remained in him. So that Ed-win Gairdner's power and interest extended to five sixths. It is true he omitted to refer to his Power of Attorney in making the mortgage; but this defect may

---

* When this case was called, and before it was opened, C. Lee suggest-ed, that it would be desirable to wait for a fuller Court, as the Judge who rendered the decree might think proper to retire from the bench.

Livingston, J. That practice has been abandoned.

Johnson, J. We have agreed among ourselves, not to excuse the Judge who passed the decree.

be supplied in a Court of Equity. 10. *Mod.* 36—*Sir Edward Cleer's case, cited by Ch. J. Parker.* 6. *Co.* 17. *(b)* *S. C.*—3. *Levinz.* 372.—2. *P. Will.* 490. *Tollet. v. Tollet.*—2. *P. Will.* 623. 1. *Ca. in Chancery* 263. *Smith v. Ashton.*—1. *Br. C. C.* 368. *Wade v. Poget*—2. *P. Will.* 222 *Coventry v. Coventry.*—1. *Str.* 596. 604. *S. C.* 4. *Br. C. C.* 462. *Jackson v. Jackson.*—*Ambler* 640. 684.—*Hob.* 165. 4. *Vez. jun.* 631.—7. *Vez.* 567.—10. *Vez.* 246.—6. *East.* 105.—*Carth.* 427.

SHIRRAS & OTHERS *v.* CAIG & MITCHEL.

There was no obligation upon the mortgagees to prove or record the deed sooner than they did. The law allows twelve months.—Neither of the deeds was recorded within ten days after its date, and therefore neither can claim a preference under that law.

It is no objection that the mortgage was made to indemnify against future indorsements. 3. *Cranch*, 73 *U. S. v. Hooe.*

If the power from James had been given to a third person, he would have conveyed to Edwin—but the power being to Edwin, he could not convey to himself, and the law will consider the equitable title, united with the power, as a legal conveyance to him.

The creditors of Edwin, who are the mortgagees, are superior in equity to Caig or Mitchel, who never paid any thing for the property, and who are indebted to Edwin at this time; and who, if so indebted, would, if necessary, be decreed, in equity, trustees for the mortgagees, rather than they should lose their debts.

The entries on the books conveyed no legal title to the property:—but if it is to be considered as stock in trade and therefore liable to be transferred by book entry, E. Gairdner, being a partner, had a right to sell and dispose of the whole partnership effects.

Harper—*Contra.*

It is admitted that the mortgage transferred all the legal and equitable estate of Edwin Gairdner, but not of James Gairdner. If an Attorney means to convey the rights of his constituent, he must speak in the name of

SHIRRAS his principal—Edwin had only one half—the other half
& OTHERS belonged to Caig and Mitchel.

*v.*          The plat not having been recorded with the deed, the

CAIG &    description of the property is imperfect—it can convey at

MITCHEL. most, only *Gairdner's Wharf*—and not the lot which lies
          at a distance on the other side of the street.

The articles of co-partnership between E. Gairdner,
Caig and Mitchel, being under seal, operate as a convey-
ance by way of covenant to stand seized.  Each party
covenants to stand seized to the use of the firm.

The Complainants admit that they concealed the mort-
gage, and held it up, to prevent injury to the credit of
Edwin Gairdner—and they contend they had a right so
to do.

Although they may have such a right *at law*, yet they
have not *in equity*.  Where the mortgagee does any
thing to induce a belief, that the mortgagor has still a
right to encumber the property (such as suffering him to
retain the title papers whereby he gains a false credit)
the first mortgagee shall be postponed to the second, who
is deceived thereby.  So in this case the deeds to Caig
and Mitchel are to be preferred to the mortgage which
was thus concealed.  1. *Fonb.* 153.

Besides, the mortgage untruly recites the whole trans-
action.  The bond was altogether fictitious.

It was calculated to impose upon the world.  The
mortgage was in truth made only to cover future contin-
gent responsibilities.

This property is to be considered as part of the joint
funds of Gairdner, Caig and Mitchel, and liable in the
first place to the debts of that firm.  The separate credi-
tors of Edwin Gairdner can only claim his share after
payment of all the joint debts.

P. B. KEY, *in reply.*

It cannot be denied that, at the date of the mortgage,
Edwin Gairdner had a legal estate in one half of the
mortgaged premises.

The mortgage, therefore, to that extent, is good, unless it want some formality, or unless the Defendants have a prior title *at law*, or some prior equity of which the Complainants had notice previously to the mortgage.

No want of formality, nor prior legal estate are sug gested; nor can it be contended that Mitchel or Caig had any prior equity as to one half the property. Mitchel in his answer expressly disclaims any interest prior to the mortgage.

It is indeed suggested that this real estate is to be considered as part of the joint stock in trade of the firm of Edwin Gairdner & Co. of Savannah, consisting of E. Gairdner and John Caig; and one partner cannot dispose of any part of the joint funds to his own use, without the consent of the other partner.

But neither at law, nor in equity, will real estate be considered as stock in trade, so as to alter the nature of the estate, unless there be some express agreement for that purpose. *3. Br. C. C. 199, 200. Thornton v. Dixon.* In the present case there were no articles of co-partnership prior to the mortgage, nor any agreement that the real estate should be converted into stock in trade. *5. Vez. 189. Smith v. Smith.*—In order to make partnership stock of real estate, it must be purchased with partnership funds, or there must be an agreement at the time of purchasing that it shall be used and invested as partnership stock.

But in the present case nothing was paid by the firm of E. Gairdner & Co. of Savannah, for this property, nor was there any agreement converting it into stock.

The firm of Gairdner, Caig & Mitchel was formed *after* the mortgage, and therefore whatever interest they took in this property was subject to the mortgage.

There can be no doubt that the mortgagees had a right under such a mortgage, to recover in equity, all advances made upon the credit of the mortgage subsequent to its date, and before notice of junior incumbrances; and recording the subsequent incumbrance is not of itself notice. *Powell on Mort. 229, 230, 285.*

SHIRRAS       As to the objection that one of the mortgagees was not
& OTHERS    a creditor at the date of the mortgage, and did not be-
    *v.*     come a creditor upon the faith of the mortgage, it is
CAIG &     laid down in *Powell on Mort.* 275, that if one purchase in
MITCHEL.   the name of another without any authority to do so, yet
————————   if he afterwards agree to it, he makes the former his
agent *ab. initio.*

The Complainants therefore, are entitled to a decree
for a foreclosure of one half of the property described in
the mortgage, and for the recovery of all sums advanced
on the faith of the mortgage before the mortgagees had
notice of the second incumbrance.

*Feb. 17, All the Judges (except Washington, J.\*) being*
*present,*

MARSHALL, *Ch. J.* delivered the opinion of the Court
as follows :

This is an appeal from a decree rendered by the Cir-
cuit Court for the district of Georgia.

Shirras and others, the Appellants, brought their bill
to foreclose the equity of redemption on two lots lying
in the town of Savannah, alledged to have been mortga-
ged to them by Edwin Gairdner. The deed of mort-
gage is dated the first of December, 1801, and purports
to be a conveyance from Edwin Gairdner and John
Caig, by Edwin Gairdner his attorney in fact. Edwin
Gairdner not appearing to have possessed any power to
act for John Caig, the conveyance, as to him, is void,
and could only pass that interest which was possessed by
Gairdner himself. The Court will proceed to inquire
what that interest was.

It appears that, on the 17th May, 1796, the premises
were conveyed to James Gairdner, Edwin Gairdner and
Robert Mitchel, merchants & co-partners of the city of
Savannah.

In 1799, this partnership was dissolved ; and, in De-
cember in the same year, James Gairdner made an en-.

* JUDGE WASHINGTON was prevented by indisposition, from attending on
the 13th, 14th, 15th, 17th and 18th of February.

try on the books of the company charging this property
to Edwin Gairdner & Co. of Charleston, at the price of
20,000 dollars.   This firm consisted of Edwin Gaird-
ner alone.   James Gairdner also executed a power of
attorney authorizing Edwin Gairdner to sell and con-
vey his interest in this and other real property.

In March, 1801, a partnership was formed between
Edwin Gairdner and John Caig to carry on trade in Sa-
vannah, under the firm of Edwin Gairdner & co.; and
in the same month, Robert Mitchel conveyed his one
third of the lots in question to Edwin Gairdner and
John Caig.

About the same time it was agreed between the house
at Charleston and that in Savannah to transfer the Sa-
vannah property to the firm trading at that place; and
entries to that effect were made in the books of both com-
panies; and possession was delivered to Edwin Gairdner
and Co. of Savannah.

Such was the state of title in December, 1801, when
the deed of mortgage bears date.

The Plaintiffs claim the whole property, or, if
not the whole, five sixths; because they suppose Edwin
Gairdner to have been equitably entitled to his own
third, to that of James Gairdner, and to half of the third
of Robert Mitchel.   But for this claim the Court is of
opinion that there can be no just pretension, because
he did not affect to convey by virtue of the power from
James Gairdner—he did not affect to pass the interest of
James Gairdner, but to pass the estate of John Caig
and himself.   Consequently the power of attorney may
be put out of the case, and the conveyance could only
operate on his own legal or equitable interest.

In law, he was seized under the original deed, and
the deed from Robert Mitchel of one undivided moiety
of the property.

Under the various agreements and entries on the books
of the firms at Charleston and Savannah which have
been stated, his equitable interest was precisely equal
to his legal interest.   In law and equity he held one

SHIRRAS moiety of the premises in question. The other moiety
& OTHERS was in John Caig.  To one sixth Caig was legally enti-
v.    tled by the conveyance from Robert Mitchel, and to
CAIG & two sixths he was equitably entitled by the agreement
MITCHEL. with Edwin Gairdner and the consequent entries on the
books.

Of the equitable interest of John Caig the mortgagees
were bound to take notice, because the purchaser of an
equitable interest, purchases at his peril, and acquires
the property burdened with every prior equity charged
upon it, because the deed itself gives notice of Caig's ti-
tle, and because Caig was in possession of the property.

The mortgage deed of December, 1804, could not,
then, in law or equity, pass more than one moiety of the
property it mentions.

A question arises on the face of the deed respecting
the extent of the property comprehended in it.  The
Plaintiff's contend that both lots are within the descrip-
tion ; the Defendants that only the wharf lot is conveyed.

The property conveyed is thus described—"All that
"lot of land, houses and wharfs in the city of Savannah
"as is particularly described by the annexed plat, and
"is generally known by the name of Gairdner's wharf."

The plat was not annexed, nor was it recorded with
the deed.  It is, however, filed as an exhibit in the cause,
and appears to be a plat of part of the town of Savannah,
including the lot on which Gairdner's wharf was, and
also one other lot belonging to the same persons, which
was designated as No. 6, and which does not adjoin the
property on which the wharves are erected.

The words descriptive of the property intended to be
conveyed do not appear to the Court to be applica-
ble to more than the wharf lot.  The word "lot" is
in the singular number; the term "houses" is satis-
fied by the fact that there are houses on the wharf
lot; and there is no evidence in the cause, nor any
reason to believe that lot No. 6 was "generally known
"by the name of Gairdner's wharf."  The Court,
therefore, cannot consider that lot as comprehended
within the conveyance.

The mortgaged property is in possession of the Defen-
dants, Caig and Mitchel, who derive their title thereto
in the following manner.

On the 7th of January, 1802, a new partnership was
formed between Gairdner, Caig and Mitchel, and, by
the articles of co-partnery, which are under seal, the Sa-
vannah property is declared to be stock in trade, and an
entry was made on the books of the old firm transferring
this property to the new concern. On the 12th of the
same month, the co-partnership of Gairdner and Caig
was dissolved.

On the 27th of July, 1802, by deeds properly executed,
one third of the property became vested in John Caig,
and one other third in Robert Mitchel.

On the 3d of November, 1802, Edwin Gairdner be-
came a bankrupt; and this bill is brought by his mortga-
gees and assignees.

The claim to foreclose is resisted by Caig and Mit-
chel, because, they say,

1st. The mortgage was not executed at the time it
bears date, but long afterwards, and on the eve of bank-
ruptcy.

2d. That the transaction is not bona fide, there being
no real debt, nor any money actually advanced by the
mortgagees.

3d. That the mortgage was kept secret, instead of be-
ing committed to record.

4th. That the whole transaction is totally variant from
that stated in the deed.

They therefore claim the property for the creditors of
Gairdner, Caig and Mitchel.

1st. From the testimony in the cause it appears that
the deed, if not executed on the day, was executed about
the day of its date; and that Gairdner, at the time, was
believed to be solvent.

2d. It appears, also, that the mortgage was executed, in part, to secure the payment of money actually due at the time, and, in part, to secure sums to be advanced, and to indemnify some of the mortgagees for liabilities to be incurred.

3d. The mortgage is dated the 1st of December, 1801, and was recorded in September, 1802.

By the laws of Georgia, a deed is valid if recorded within twelve months; but any deed recorded within ten days after its execution takes preference of deeds not recorded within that time, or previously on the record.

It appears to the Court, that neither negligence, nor that fraud which is inferred from the mere fact of omitting to place a deed on record, can, with propriety, be imputed to the person who has used all the dispatch which the law requires. If subsequent purchasers without notice, sustain an injury within the time allowed for recording a deed, the injury is to be ascribed to the law, not to the individual who has complied with its requisition.

In this case the subsequent purchasers might have proceeded to record their deeds within ten days, and have thereby obtained the preference they claim, but they have failed to do so. They are themselves chargeable with the very negligence which they ascribe to their adversaries; and, were they to be preferred, the Court would invert the well established rule of law, and postpone, under similar circumstances, a prior to a subsequent deed.

4th. It is true that the real transaction does not appear on the face of the mortgage. The deed purports to secure a debt of 30,000*l.* sterling due to all the mortgagees. It was really intended to secure different sums, due at the time from particular mortgagees, advances afterwards to be made, and liabilities to be incurred to an uncertain amount.

It is not to be denied, that a deed, which misrepresents the transaction it recites, and the consideration on which it is executed, is liable to suspicion. It must sustain a

rigorous examination. It is, certainly, always advisable fairly and plainly to state the truth.

But if, upon investigation, the real transaction shall appear to be fair, though somewhat variant from that which is described, it would seem to be unjust and unprecedented to deprive the person claiming under the deed, of his real equitable rights, unless it be in favor of a person who has been, in fact, injured and deceived by the misrepresentation.

That cannot have happened in the present case.

There is the less reason for imputing blame to the mortgagees, in this case, because the deed was prepared by the mortgagor himself, and executed without being inspected by them, so far as appears in the case.

It is, then, the opinion of the Court that the Plaintiffs, Shirras and others, have a just title, under their mortgage deed, to subject one moiety of the lot, or parcel of ground, commonly known by the name of Gairdner's Wharf, to the payment of the debts still remaining due to them, which were either due at the date of the mortgage, or were afterwards contracted upon its faith, either by advances actually made or incurred prior to the receipt of actual notice of the subsequent title of the Defendants, Caig and Mitchel; and that the decree of the Circuit Court of Georgia, so far as it is inconsistent with this opinion, ought to be reversed.

*The following is the decree of this Court.*

This cause came on to be heard on the transcript of the record, and was argued by counsel. On consideration whereof, it is the opinion of this Court, that the deed of mortgage in the proceedings mentioned, and dated on the 1st of December, 1801, is, in law, a valid conveyance of one moiety of that lot of land, houses and Wharves in the City of Savannah, which was generally known by the name of Gairdner's Wharf, being the parcel of ground lying between the river and the street, and that the mortgagees in the said deed mentioned, are entitled to foreclose the equity of redemption in the said mortgaged property, and to obtain a sale

SHIRRAS & OTHERS *v.* CAIG & MITCHEL.

thereof, and to apply the proceeds of the said sale to the payment of what remains unsatisfied of their respective debts, which were either due at the date of the mortgage, or have been since contracted, either on account of monies advanced, or liabilities incurred prior to their receiving actual notice of the title of the Defendants, John Caig, and Robert Mitchel. And the decree of the Circuit Court for the District of Georgia, so far as it is inconsistent with this opinion, is reversed and annulled, and in all other things is affirmed; and the cause is remanded to the said Circuit Court for the District of Georgia, that further proceedings may be had therein according to equity.