CRAIG v. TAPPIN and others.[1]

TAPPIN v. CRAIG and others.

Where the bill states a mortgage, apparently valid for the whole sum expressed in it, and then avers that it was given for a smaller sum previously advanced and also to secure future advances, the defendant cannot rely upon one of these averments as an admission in his favor and at the same time exclude the other.

A mortgage to secure future advances is valid. It is not necessary that such a mortgage should express that object on its face. It suffices that the extent of the intended lien be clearly defined. But the omission to state the object, renders the mortgage liable to suspicion, and imposes upon the mortgagee stricter proof of the payment of the consideration.

The policy of the registry laws, does not affect the question of its validity in this respect.

As between a mortgage to secure future advances, and a subsequent mortgage on the same premises for an existing debt, the latter is valid and takes precedence over all advances made upon the former, after such second mortgage is executed. But those made before that time, though after the first mortgagee knows of the intention of the debtor to execute it, are valid against the latter.

A prior mortgagee of lands, took further security by a mortgage of goods, and afterwards took possession of the goods. *Held*, that he had the option to sell them at auction and credit the proceeds on his debt, or to keep them and account for their market value ; and having retained them, he was decreed to account for such value.

It is not a badge of fraud in a mortgage, that it was taken after the creditor learned of the debtor's intention to secure another creditor by a mortgage on the same land.

A settler on lands of the United States, entitled to pre-emption, has no title or estate in the land, which he can sell or incumber. He has simply a right to become the purchaser at the minimum price of the public lands, in preference to

Craig v. Tappin.

all others ; and the right is forfeited, if when the land is offered for sale, he is unable or unwilling to pay that price.

Where on a bill and cross bill, each party claimed more than he was entitled to, but the complainant in the original suit mainly succeeded; he was allowed his costs of that suit out of the fund, and all the other costs were directed to be borne by the respective parties who incurred them.

April 18, 23, 24 ; August 17, 1844.

THE case came before the court on an original bill filed by John Craig to foreclose a mortgage executed to him by Hugh Graham and wife, and upon a cross bill exhibited by Tappin, a subsequent mortgagee of the same premises. Craig's mortgage was dated May 1, 1839, and was conditioned for the payment of $18,000 in five years with interest half yearly, according to Graham's bond of the same date. It conveyed divers lands in the city of New York, was acknowledged in Illinois where the grantors resided, on the 24th of December, 1839, and was recorded January 21st, 1840. The bill filed by Craig, after stating the due execution and delivery of the bond and mortgage, alleged that the mortgage was given to secure him for moneys previously advanced to Graham and for other moneys which he agreed to advance, from time to time ; and it set forth in a schedule the dates and amounts of all such advances. The testimony sustained the bill in this respect. A part of the amount claimed, was paid by Craig to Graham after the 15th of January, 1840, on which day Graham and wife executed a mortgage on the same lands to John Tappin for $4640, which was acknowledged March 16th, and recorded April 7, 1840.

On the 4th of April, 1840, Graham, who was then in the possession of about seven hundred acres of government lands at Dixon's Ferry, in the state of Illinois, and of a large quantity of movable property there, executed to Craig a mortgage on both the lands and the personal property, reciting an indebtedness of ten thousand dollars to Craig, and conditioned to pay it on the fourth of June ensuing. This was confessedly for the same debt, or a part of it, which was secured by the first mentioned mortgage. When the Illinois mortgage fell due, Craig took possession of the personal property and retained it, claiming it as his own, as long afterwards as 1841. It was worth about $2000 when the mortgage became payable.

When the government lands came to be offered for sale, Graham neglected to become the purchaser, and they were bought by some member of his family, at the minimum price of the public lands. Craig never obtained any thing by means of his Illinois mortgage, except the personal effects mortgaged.

Craig knew of Graham's intention to secure Tappin's debt by a mortgage, before his own was actually executed and delivered.

The answer of Tappin and the cross bill sought to impeach Craig's mortgage on the ground of fraud in various particulars. Tappin also claimed that it was invalid because the intention to secure future advances was not expressed in it; and that at all events, it was not good for advances made after Craig knew of Graham's intention to mortgage to Tappin. He further insisted that Craig was bound to account for the whole value of the Illinois lands mortgaged, as a payment towards his debt, as also for the value of the goods and chattels included in that mortgage, alleging that Craig became the absolute owner of the whole early in 1841, and that the same were worth $10,000 to $12,000.

There were numerous other matters presented by the pleadings and proofs, which it is not deemed necessary to notice, and so much of the judgment of the court as related to those matters, is omitted.

*R. S. Waller* and *S. G. Raymond*, for Craig.

*Charles Taylor*, for Tappin.

THE ASSISTANT VICE-CHANCELLOR.—The answer to the cross bill being evidence in the cross suit, I think that Tappin's case stands quite as favorably for him in the original suit, as it does in the cross suit, or in both combined. I will therefore consider the case at large as it is presented by the pleadings and testimony in the original suit.

Fraud constitutes the principal ground of defence, and in support of it there are several distinct evidences relied upon.

*First.* The mortgage expresses a consideration of $18,000, when it is said there was not much more than a third of that sum due at the time it was executed, and but $10,000 was due

according to Craig's own showing. Craig's account of it is, that the mortgage was given to secure advances already made and money to be advanced from time to time. He comes into this court with a bond and mortgage valid presumptively, for $18,000; but he says that in fact they were given for both past and future advances, and there never was but about $13,000 advanced.

Now the defendant cannot lay hold of this admission that only $13,000 was advanced, and say to the complainant, you must prove the rest of your story that the mortgage was given to secure future advances.(a)

The testimony from Illinois as to what Craig said of his advances, aside from the statement in the bill, would be referred to the mortgages executed in that state. And I believe there is no other evidence in the original suit, which proves that the whole mortgage debt was not at some time advanced. If reference be made to the cross suit, we encounter Craig's answer as to the consideration, which is responsive to the bill.

The testimony of Mr. Young favors the allegation in the original bill as to the future advances. It shows that the land which was subsequently mortgaged, was regarded by all the parties as the fund from which Craig was to be reimbursed; that the principal advances were made upon the faith of this fund; and that efforts were made to sell the land, which were ineffectual. Then Craig's mortgage was given, and the advances were still continued.

The fact must be taken as established, that the mortgage was intended to secure future, as well as precedent advances.

Then as to the amount which Craig claims that he had advanced when the mortgage was executed. Is his allegation in that respect untrue, and his claim therefore fraudulent?

The evidence, instead of showing its falsity, proves that almost the entire sum was advanced. Objections were made to the testimony of Mrs. Graham's transactions, but I think without cause. She was the agent of her husband; her acts were his;

---

(a) See *Russell* v. *Kinney*, 1 Sandford's Ch. Rep. 34, which case was affirmed by the Court for the Correction of Errors in December, 1845.

and he ratified them by executing the mortgage. So, as to the moneys paid to Mr. Young for Graham. The contents of the power under which Young acted, need not be shown in order to sustain an advance made to him as agent, sworn to be for the benefit of the principal, and subsequently ratified by him.

Although the burthen of proof was not upon Craig, he has proved nine-tenths of the amount which he charged in his bill as having been advanced prior to the execution of the mortgage, and all of the subsequent advances which are material in this case.

Thus there is no fraud shown in the consideration of the mortgage as set up by Craig. So far, it appears to have been executed in good faith, unless the omission in the mortgage itself, to state that the whole sum had not been advanced, sustains the imputation of fraud.

It is no longer a question, that mortgages to secure future advances, are good to the extent secured thereby.(a) But it is insisted that the intention must be expressed in the mortgage, or else it is fraudulent and void as against creditors ; and that the policy of our registry laws requires this, for otherwise the record will never disclose the extent of the existing incumbrances.

The reason assigned may be a strong argument against sustaining liens for contemplated advances in any case ; but that point having been passed, the force of the reason appears to be spent. If in this instance the mortgage had stated that it was designed to secure future advances, the subsequent creditor or incumbrancer would obtain no useful information from that statement. So in any case, the record would afford him no certainty. His only resource would be an application to the mortgagee, to ascertain the extent of the advances already made; (a statement which the latter would be bound to furnish truly ;) very much as in an ordinary transaction, when finding a large lien before him, he would inquire of the creditor whether all or how much of it was due.

The only authority to which I was referred, that in any re-

(a) See *Lansing* v. *Woodworth*, Vol. 1st, page 43.

spect sustains Tappin's ground on this point, is an expression of my learned predecessor in *Walker* v. *Snediker*, 1 Hoff. Ch. Rep. 146, where he says that the better opinion if not the decided law is, that a mortgage to secure future responsibilities must express the object, and that it is certain that such mortgage cannot be rendered available for future liabilities by a subsequent parol agreement. At the same time, he says that such a mortgage if it be not a security for future advances, is not made void for the amount truly due and the liabilities then existing; and he quotes the strong language of Chief Justice Marshall to that effect in *Shirras* v. *Caig*, 7 Cranch, 34.

If by future responsibilities, the late Assistant Vice-Chancellor had in view future advances pursuant to an agreement cotemporary with the mortgage, I cannot assent to the whole of his proposition. I will first observe upon the cases to which he refers. The first was *Ex parte Hooper*, 1 Meriv. 7, in which Lord Eldon decided that a mortgage for £400 could not, in pursuance of a parol agreement made long afterwards that it should stand as security for a further balance of £400 on account, tack the last sum to the first and hold the mortgage as a lien for £800 as against other creditors.

The next case is *Hendricks* v. *Robinson*, 2 J. C. R. 283, in which Chancellor Kent held that an assignment of personal property by an insolvent, to secure future advances and responsibilities as well as existing engagements, is valid if made in good faith.

In *James* v. *Morey*, 2 Cowen, 246, (S. C. 6 J. C. R. 417,) Morey claimed under a deed, absolute on its face and expressing a consideration of $10,000, but which was intended as security for a note of $5000, on which Morey was an indorser, and for indemnity against a bond which he had executed as surety for the grantor. This was held valid as a mortgage, both by Chancellor Kent, and by the judges who delivered opinions in the Court for the Correction of Errors; although the decision in that court was adverse to Morey on other grounds. His attempt to make the deed a security for other demands was overruled, as the same thing was in *Ex parte Hooper*. But the opinions delivered in *James* v. *Morey* in both courts, are full to the point

that the deed was a valid security for all the matters covered by the parol agreement between the parties when it was made.

In *Divver* v. *McLaughlin*, 2 Wend. 596, a mortgage of goods for $800 when there was but $100 to $150 due, and where there were other badges of fraud, was held to be fraudulent. The absence of a statement in the mortgage that it was also to secure future advances, was commented upon by the Chief Justice, with many other circumstances, but he does not say that this omission is of itself essential; and there were other abundant evidences of fraud in the case.

Two cases in the Supreme Court of the United States were also cited in *Walker* v. *Snediker*. *The United States* v. *Hooe*, 3 Cranch, 73, was one, and in that case as the mortgage recited its object, the point under consideration did not arise. The other case was *Shirras* v. *Caig*, before cited, which appears to me to be an authority on the other side of the question. There the mortgage purported to secure a debt of £30,000 due to all the mortgagees. In fact it was intended to secure different sums due at the time to various persons among the mortgagees, advances thereafter to be made, and liabilities to be incurred to an uncertain amount. And it was objected that the whole transaction was totally variant from that stated in the deed. The court nevertheless held it to be valid. Chief Justice Marshall says that such a deed is liable to suspicion, but if on investigation the transaction turns out to be fair, it would be unjust to deprive the mortgagee of his real equitable rights, unless it be in favor of a person who has been in fact injured by the misrepresentation made by the deed.

I think, therefore, I may say that there is no authority for holding that a mortgage to secure future advances, must express that object in order to be valid.

I will refer to a few other cases. In *Brinckerhoff* v. *Marvin*, 5 J. C. R. 320, 326, the object of the judgments, which were to secure future as well as existing indorsements, was expressed in receipts given, and so far as notice to creditors or purchasers was concerned, might as well have rested in parol. Nevertheless they were held to be valid. Chancellor Kent said "A judgment

or other security may be taken and held for future responsibilities *to the extent of it*; and he cited *Shirras* v. *Caig*.

In *St. Andrew's Church* v. *Tompkins*, 7 J. C. R. 14, the prior mortgagee attempted to extend his mortgage as against a second mortgagee, so as to embrace interest, which was not expressed in it, but which the mortgagor agreed to pay. The Chancellor decided that it could not be done, and I think expresses the true principle on the subject. He says, " it is the policy of the registry act that a subsequent incumbrancer should be able to ascertain with certainty, *the extent* of the prior incumbrance," and that moneys not mentioned in the prior mortgage, cannot be covered by it to the prejudice of subsequent liens.

In other words, the mortgage or judgment must show on its face and by the record, the utmost amount or sum which they are intended to secure. Not that the record must always show, or was ever intended to show, how much was actually due or unpaid on any judgment or mortgage.

So Chancellor Kent, in his Commentaries, (Vol. 4, p. 175, 176, 2d ed.) lays it down that a mortgage or judgment may be taken and held as a security for future advances and responsibilities, *to the extent of it*, when this is a constituent part of the original agreement. He also says that the record of the lien should give the requisite information as to the extent and certainty of the contract, so that a junior creditor may, by inspection of the record and by common prudence and diligence, ascertain the extent of the incumbrance. I should have mentioned, that in *Livingston* v. *McInlay*, 16 Johns. 165, where the Supreme Court sustained a judgment by confession to secure future advances, the bond was in the penalty of $4000 with a condition for the payment of $2000. There was only $1118 due when it was given, but there was a verbal agreement for future advances, and a written promise by the creditors to issue execution for no more than was due.

The case of *Lyle* v. *Ducomb*, 5 Binney, 585, was similar in principle to *Shirras* v. *Caig*. The mortgage was made by Ducomb for the payment of $9000 on demand. On the back of it, forming no part of the instrument and not recorded, was an agreement that it was to secure Lyle and others from loss by notes

given and to be given by them for Ducomb's accommodation. Subsequently and after another lien had intervened, the agreement was varied, so as to cover indorsements as well as notes drawn for Ducomb. The court held it a valid mortgage and a prior lien to the extent of the $9000 for both classes of notes; the difference between drawing and indorsing, being deemed matter of form, and working no prejudice to other creditors.

In *The United States* v. *Sturges*, 1 Paine's C. C. R. 525, the mortgage was for the absolute payment of a specified sum, but was intended as indemnity for signing custom house bonds as surety for the mortgagor. It was upheld for that purpose, against the wishes of the parties to the mortgage, who desired to use it as an absolute lien for the payment of the sum expressed.

The defendant's counsel referred me to a series of decisions on this subject in Connecticut. In *Pettibone* v. *Griswold*, 4 Conn. R. 158, the condition of the mortgage was to pay a note of $4000, and to pay all other notes the grantee might indorse or give for the grantor. The consideration expressed was $4000. The court held that the condition was too indefinite; that it did not give reasonable notice of the incumbrance on the land mortgaged.

The same principle was asserted in *Stoughton* v. *Pasco*, 5 Conn. 442, but with a different result. There a trustee who was bound to account to a creditor and owed him an indefinite sum then unascertained, gave him a mortgage conditioned to pay the trust indebtedness describing it, but specifying no amount. It was upheld as a good lien for the amount subsequently ascertained to be due. Chief Justice Hosmer said that the policy of the recording laws does not require that perfect and complete notice should be given without any inquiry *dehors* the record. That in equity, the notice is sufficient which presents a certain object concerning which successful inquiries may be made without unreasonable inconvenience. In *Shepard* v. *Shepard*, 6 ibid. 37, the mortgage was to secure an indorsement of $800 and future indorsements if asked, not exceeding $1200. This was held defective as to the latter, because it was perfectly indefinite as to time and subject matter.

On the other hand in *Hubbard* v. *Savage*, 8 Conn. 215, the

condition of the mortgage was to pay a note of $1000 which the grantee had indorsed at the Middletown Bank, and $1000 in a note or notes thereafter which the grantee had agreed to indorse when requested; and it was held valid for the whole $2000.

In *Booth* v. *Barnum*, 9 ibid. 286, the principle was adopted, that a mortgage debt must be described with sufficient certainty to enable subsequent creditors and purchasers to ascertain either from the condition of the deed, or inquiry *aliunde*, the extent of the incumbrance.　There the condition described one debt as of $30 or thereabouts, and the other as of $40 or thereabouts, when in fact the one was $25 21, and the other was $59 66.　It was held sufficient.

In *Hart* v. *Chalker*, 14 ibid. 77, the condition described the debt as due by note dated on a certain date and payable on demand with interest, without specifying the amount.　This was held insufficient.　The Chief Justice says if a mortgage is given to secure a debt not ascertained, such *data* must be given respecting the debt as will put any one interested in the inquiry, upon the track leading to a discovery.

These decisions in Connecticut, as a whole, sustain the position that the mortgage need not express that it is to secure future advances, or present or future indorsements; but it must exhibit *the extent of the lien* intended to be created; and this with an inquiry from the mortgagee as to the amount due, will furnish all requisite information to parties interested.　My examination of the authorities therefore confirms me in the view with which I set out.　By the mortgage in question, when recorded, all the world had notice that Craig had a lien which did or would amount to $18,000.　This gave to all, information of the *extent of the contract;* and then by the use of the ordinary diligence and prudence of inquiring of the mortgagee, any person interested could have ascertained the *extent of the incumbrance.*　If Craig had advanced $18,000, Tappin on endeavoring to secure his debt, would have been driven to precisely the same inquiry; for in that case as well as where there is to be a future advance, the record alone would give no information of the existing or actual extent of the incumbrance.

I must therefore hold that a mortgage intended to secure future

advances, need not express that object in the mortgage itself. It would be better to state such object in the mortgage, and when it is not stated, the mortgage will be liable to suspicion, and the holder put upon stricter proof of the payment of the consideration; but its omission will not render the security invalid.

Another charge of fraud is made because Craig knew of Graham's intention to mortgage the same premises to secure the debt of Chartres or Tappin.

One witness testifies that Craig knew of this intention prior to the execution of the mortgage to him, but not that Graham was urged or pressed to complete it. Such knowledge was well calculated to stimulate Craig to secure his own debt, and it would have been surprising if he had failed to make the attempt. Having made it and succeeded, the act is to be attributed to his desire to save his debt, not to a wish to hinder and delay Tappin. The motive was selfishness, not malice or ill will; and it was entirely proper, although the direct and necessary result of his obtaining security, was to prevent Tappin from collecting his debt.

I do not perceive how the attachment proceedings stated in the cross bill, could have changed Tappin's position. The mortgage to Craig was delivered in December, and took effect from that time as against the attachment.

Again, the mortgages of Graham's personal and real estate in Illinois, taken by Craig, are alleged to be fraudulent, and to furnish evidence of a fraudulent intent in the previous mortgage to Craig, inasmuch as it discloses a design to cover the whole of Graham's property and place it beyond the reach of his creditors. That within a few months after taking a mortgage on property here for $18,000 as the limit of the debt, Craig with only $11,000 due to him thereon, obtained a mortgage in Illinois for further security.

We have no evidence as to the value of the mortgaged premises here in the years 1838 and 1839, when the advances were made by Craig; and it therefore does not appear but that they were worth the $18,000 expressed in the mortgage. It was not denied that in the subsequent depreciation of real estate in this city, they became worth much less than the amount due to him in December, 1839.

Craig v. Tappin.

It is no uncommon thing for a creditor to overrate the value of the security offered to him, and on discovering his error, to grasp all the additional security which he can coax or coerce from his debtor. And I am not prepared to say on the testimony before me, that Craig acted from any worse impulse than this, in taking his Illinois mortgage in April, 1840. The security obtained was not very extensive. Graham's real estate was no estate at all. He had settled upon government land, and improved it, and had thus become entitled under the acts of Congress, to purchase it at the minimum price, whenever it should be offered for sale by the government. This mere right he could not incumber. The pre-emption act of 1828, revised in 1838, declares, that all assignments and transfers of the right of pre-emption given by that act, shall be null and void. And the act of 1838 requires the claimant of the benefit of the law, the actual settler, to make oath that he has not directly or indirectly made any agreement or contract whatever, by which the title which he might acquire from the government of the United States should enure to the use or benefit of any one except himself. (Laws of the U. S. 1828, ch. 434, § 3 ; 1838, ch. 119, § 1 ; Continuation of Bioren's Edition of Laws of U. S., Vol. 8, p. 375 ; and Vol. 9, p. 801.)

The Supreme Court of Illinois decided in *Davenport* v. *Farrar*, 1 Scammon's R. 314, that a pre-emption right is not an estate of which a widow can be endowed. They say that it is a mere right to purchase the land in preference to others, and if the pre-emptioner is either unable or unwilling to purchase at the time mentioned in the law, the land can be sold to others, and he turned out of possession as an intruder.

So in this case, the right itself was extinguished, for on the lands being brought into market neither Graham or Craig became the purchaser.

The personal property mortgaged was worth $2000 in 1840, and afterwards a much less sum.

I do not see the evidence of fraud against the Illinois creditors, which Tappin's counsel discerned so clearly. The debt was due to Craig. It was not adequately secured here. Craig was living on the land there, and in two or three months after,

claimed the property as mortgagee in possession, and maintained that claim as to the chattels, in a suit at law there. This does not appear to be fraudulent against creditors.

After an attentive examination of the various charges of fraud brought against the mortgage in question, I have come to the conclusion, that they do not successfully impeach the mortgage, and that it must be upheld.

The next inquiry is as to the extent to which it is to be carried as a prior lien to Tappin's mortgage.

It is contended by Tappin, that as against his, Craig's mortgage is good only for the amount which had been advanced up to the time when Tappin's mortgage was agreed upon. I think the true period is the time when the latter mortgage was executed. (See *Brinckerhoff* v. *Marvin*, 5 J. C. R. 327; per Chancellor Kent.)

The amount of Craig's advances when the mortgage to Tappin was executed, were $10,361 04, with interest from the dates of the advances as set forth in the schedule annexed to the bill, except that the two first items should not bear interest prior to October, 1834.

The testimony of Craig's declarations in Illinois, which were proved by Tappin for another purpose, confirm the other proof as to the amount which Craig had advanced to and for Graham.

Then we have the point that Craig at all events must account for the value of the Illinois property at the time it went into his hands.

As to the real estate, if there were in truth any estate, the only account would be of the rents and profits, there never having been any foreclosure of the mortgage. But as I have mentioned, Graham had but a mere right of pre-emption, and the title passed very soon into other hands. There will be no accounting for the real estate. As to the personal property in Illinois, the case is wholly different. Craig took the possession of it by virtue of his mortgage. He had a right to keep it and account for its market value, or to sell it at auction and credit the net proceeds upon his debt. He pursued the former course, and he must account accordingly. He is entitled however to be allowed in this accounting for the money which he advanced to Graham

after the execution of Tappin's mortgage, and before the date of the Illinois mortgage. The parties may go before the master on the subject of the value of the personal property mortgaged at the time that mortgage became due, unless Craig elects to account for it at the sum of $2000 which is the value put upon it by the witness William W. Graham.

The complainant in the first suit is entitled to a decree accordingly, and the cross bill must be dismissed.

Each party has claimed more than he was entitled to, and I will dispose of the costs by giving to Craig his costs of the original suit out of the fund, and will leave all the other costs to be borne by the respective parties who incurred them.