BOARD OF COM'RS OF MATTAMUSKEET DRAINAGE DIST. et al. v. A. V. WILLS & SONS et al.

(District Court, E. D. North Carolina. August 16, 1916.)

No. 379.

1. CORPORATIONS ⬥47—EFFECT OF CHANGE OF NAME.

A change of name by a corporation in conformity with a state statute does not effect any change in the legal identity of the corporation.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 134, 135; Dec. Dig. ⬥47.]

2. ACKNOWLEDGMENT ⬥38—CORPORATIONS—SUFFICIENCY OF CERTIFICATE.

Under the decisions of the Supreme Court of North Carolina, the probate of a deed of a corporation is sufficient if it substantially shows the facts required by the statute (Pell's Revisal N. C. 1908, § 1005) which ex-

pressly provides that the form prescribed "shall not exclude other forms of probate."

[Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 217–220; Dec. Dig. ☞38.]

**3. MORTGAGES ☞121—MORTGAGE BY CORPORATION—EFFECT OF SUBSEQUENT MODIFICATION OF CONTRACT.**

The commissioners of a drainage district and a corporation owning a large tract of land in the district entered into a contract with a firm to construct a drainage system. By its terms the contractors were to be paid monthly as the work progressed a certain amount in cash and the remainder in notes of the corporation secured by a mortgage. The notes and mortgage were executed, and the notes as required by the contract were deposited with the commissioners to be delivered to the contractors as earned. All extra work was to be paid for in cash. *Held*, that a subsequent parol agreement by the parties, made at the request of the contractors and subsequently formally ratified by the corporation by which the contractors were paid a further sum in cash before they were to receive the notes, and which necessitated the application of the notes on extra work, did not invalidate the mortgage or furnish any ground for the refusal of the contractors to proceed with the work.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 237–241; Dec. Dig. ☞121.]

**4. MORTGAGES ☞159—PRIORITIES BETWEEN MORTGAGES.**

Such mortgage is also valid and constitutes a prior lien as against a subsequent mortgage executed by the corporation on its lands which expressly recognized and excepted the prior mortgage, and this as to notes delivered by the commissioners to the contractors either before or after the execution of the second mortgage.

[Ed. Note.—For other cases, see Mortgages, Cent. Dig. §§ 312, 330; Dec. Dig. ☞159.]

**5. CONTRACTS ☞192—CONSTRUCTION—"SALE."**

Contemporaneously with the making of the drainage contract, the corporation executed a collateral contract by which it agreed that, in case of sale of any of its lands not included in the mortgage, it would deposit one-half the proceeds, whether in cash or notes, the cash to be applied in payment of the notes to the contractors as they matured and the purchase notes to be held for their further security until all were paid. The second mortgage executed by the corporation, which covered all of its lands only a part of which were covered by the drainage mortgage, secured an issue of bonds for a large amount. *Held*, that such mortgage constituted a "sale" within the meaning of the collateral contract, and that the corporation was required to deposit thereunder one-half of the proceeds of the bonds as sold until the drainage notes were paid.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 846–851; Dec. Dig. ☞192.

For other definitions, see Words and Phrases, First and Second Series, Sale.]

**6. SPECIFIC PERFORMANCE ☞74—CONTRACTS ENFORCEABLE—CONTRACT FOR DRAINAGE WORK.**

The commissioners of a drainage district, organized under the state law and representing 587 landowners, contracted with defendants to construct a drainage system in accordance with plans and specifications annexed for the drainage of a large lake near the coast and surrounding lands. Defendants were to be paid $226,000 on monthly estimates, the first $159,000 in cash and the remainder in notes of a corporation which owned a large tract of land, secured by a mortgage. The notes and mortgage were executed and the notes placed in the hands of the commissioners for delivery to defendants as earned. After the greater part of the

work had been done and paid for and defendants had received all of the cash payments, they refused to proceed on the ground that the mortgage of the corporation, as to notes thereafter to be delivered, was invalid. The work was left in such condition that it was liable to be destroyed by the waters of the sea during high winds, and much of the land on which money had been expended damaged to an extent which could not be accurately computed. It was practically impossible to obtain a new contractor to finish the work which required special and expensive equipment and accept the notes in payment, and the commissioners were without sufficient money to pay for it. The remaining work was specifically shown by the specifications and could be completed within a year. *Held* that, under the circumstances and upon a finding that the notes were amply secured, the court might properly decree a specific performance of the contract.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. § 209; Dec. Dig. ☞74.]

In Equity. Suit by the Board of Drainage Commissioners of Mattamuskeet Drainage District and others against A. V. Wills & Sons and others. Decree for complainants.

E. L. Travis, of Raleigh, N. C., for plaintiffs.
W. W. Peirce, of Goldsboro, N. C., and William & Barry Mumford, of Pittsfield, Ill., for defendants.

CONNOR, District Judge. This is a bill in equity, in which plaintiffs ask for a mandatory injunction, compelling defendants to perform their contractual obligation in prosecuting the work of dredging and draining Mattamuskeet Lake, Hyde county, N. C.

The pleadings and exhibits disclose the following case: D. N. Graves, a citizen and inhabitant of the state of Masssachusetts, together with D. H. Carter and John P. Kerr, citizens and inhabitants of the state of North Carolina, constitute the board of drainage commissioners of Mattamuskeet drainage district, Hyde county, N. C., as provided by chapter 442, Public Laws of North Carolina (modified by chapter 509 thereof) Session 1909. They will hereinafter be referred to as the "drainage commissioners." They are authorized and empowered to make the contracts hereinafter set forth. The Southern Land Reclamation Company, the name whereof has been changed, as will more fully appear, to the New Holland Farms, Inc., is a corporation created by and pursuant to the laws of North Carolina, and is the owner of the lands, hereinafter referred to, within the boundaries of the Mattamuskeet drainage district. It will hereinafter be referred to as the "reclamation company" or the "New Holland Farms, Inc."

Defendants A. V. Wills & Sons, trading as partners, are citizens and inhabitants of the state of Illinois. The defendant Federal Trust Company is a corporation created by the laws of the state of Massachusetts. For the purpose of reclaiming the lands of the reclamation company, and of other landowners in said district, plaintiffs and defendants Wills & Sons, on the 16th day of July, 1913, entered into a contract in writing, the terms of which, so far as relevant to the decision of the questions presented here, are: Defendants, hereinafter referred to as the "contractors," agreed to construct certain canals, ditches, and levees for the purpose of draining the lake, containing

48,630 acres, and lands surrounding the lake, aggregating 99,-868 acres, in accordance with the specifications, maps, etc., attached to the contract. They were to receive in payment for the work the sum of $266,965.28. Payments were to be made monthly, as the work progressed, in accordance with estimates of the engineers. For the construction work, as performed up to, and including, the sum of $159,000, the contractors were to be paid in cash, which sum the drainage district then had, and which was applicable to construction work, "and no other use or purpose whatever."

The contractors agreed with the drainage commissioners that they would receive in payment of the balance of the consideration agreed upon, for said material and work, the promissory notes of the reclamation company; that such notes should be duly executed by the reclamation company in the form attached to the contract and made a part thereof. They were to bear even date with the contract, and be payable to the order of the contractors. One hundred and nineteen of the notes to be made for the principal sum of $1,000 each, and one for the sum of $961.42; each of the notes, when delivered, to be indorsed and marked by the drainage commissioners with the date of the delivery, and each to be due one year from such date of delivery and to bear interest from that date until paid at the rate of 6 per cent; per annum. The notes of the reclamation company to be secured by a first mortgage, duly executed by the company and delivered to the contractors, at the date of the contract, upon about 13,500 acres of connected lands within the drainage district which land was then owned by the reclamation company. After the full cash payment of $159,000 was made, the notes were to be taken and received by the contractors in payment of such parts of the work, at 90 cents on the dollar of their face value. If, at any time, or times, when payments should be due the contractors, in notes of the reclamation company, the drainage district should pay, or cause to be paid, to the contractors, the estimates earned, in cash, instead of notes, the contractors agreed, in sufficient legal form, to release from the lien of their mortgage contiguous land described in the mortgage in the ratio of one acre of land for each ten dollars so paid.

It was further provided:

"That any and all extra work done under this contract, by the contractors, beyond and in excess of, the principal work for which the sum of $266,965.28 is hereinabove contracted to be paid, shall be paid in cash by said drainage district, out of assets provided for that purpose."

Supplemental to and at the date and place of the contract of July 16, 1913, an agreement was executed by the reclamation company, in which it was stipulated that:

"If the said reclamation company shall, before the complete performance of the foregoing contract, or the payment in full of all notes of the Southern Land Reclamation Company, which was to be delivered to A. V. Wills & Sons, under the terms of the foregoing contract, sell any land belonging to it, lying in the Mattamuskeet drainage district, not included in the mortgage referred to in the foregoing contract, the said Southern Land Reclamation Company will deposit one-half of the cash proceeds of any such sale and one-half in amount and value of any notes or other securities, hereinafter known as, and called, 'purchase notes,' taken to cover the other part of the

purchase price of any of such lands as sold, with some bank to be agreed upon by the parties hereto, such deposits of cash, and of purchase notes, to be held and used in accordance with the following provisions."

It was, in said supplemental contract, further provided that such cash so deposited should be applied to the payment, in the order of their number, of such of the said mortgage notes as may then have been delivered by the drainage district. Such purchase notes, as may have been deposited to be held by the custodian, as further security for the payment of such mortgage notes, as may have been delivered, and were then unpaid, when payments were made of such purchase notes, the amount was to be applied in the same manner as cash payment. The cash payment, or purchase notes, taken for land by the reclamation company, deposited as provided by the supplemental contract, were not to exceed the amount of the notes held by the contractors and if, at any time, either the cash or purchase notes did exceed the amount of said notes, they were to be redelivered to the reclamation company to the amount in excess of such notes held by the contractors, at that time. The reclamation company reserved the right to pay, in cash, without discount, any amount which it should owe to the contractors and for which the drainage district held its notes to be delivered under the terms of the original contract, "and in case such cash payments being made, the mortgage notes for which such cash payments are substituted, shall thereupon be delivered by the drainage district or by its commissioners to the Southern Land Reclamation Company, instead of the contractors, and the contractors shall, thereupon, in accordance with the terms of said mortgage covering approximately 13,500 acres, make partial release from the said mortgage at the rate of an acre of land for each ten dollars in cash so paid."

Pursuant to the terms of said contract, the reclamation company on July 26, 1913, by its duly authorized officers and under its corporate seal, executed its corporate notes in the denominations, and in accordance with the terms of said contract, aggregating the sum of $119,961.42 and, on the same day, delivered said notes to the board of drainage commissioners for the purpose and upon the trusts set forth in said contract, and on the same day, said reclamation company duly executed to C. E. Dunham and C. T. Laird, trustees, a deed in trust, conveying to them a part of the land belonging to said reclamation company, being a part of what is known as "Mattamuskeet," described by metes and bounds, containing 13,511 acres, in special trust to secure the payment of said notes, which were particularly referred to and described, with power of sale in said trustees, in default of payment thereof, as they fell due. This deed of trust was duly recorded in the office of the register of deeds of Hyde county, N. C., on August 14, 1913, and constituted the first lien on said land. The deed was duly executed by said corporation and was, in all respects, a good and valid conveyance of the land for the purpose for which it was executed.

On February 14, 1914, the board of drainage commissioners, having decided to make certain changes in the character of levees, required

by the original contract, entered into a supplemental contract with the contractors to construct the boundary levee in accordance with said supplemental contract at the price of ten cents per cubic yard. It was stipulated that the said contract should be supplemental to the contract of July 16, 1913, and, except as to matter of boundary levee, in no way affect any other agreement between the parties thereto— that the work contracted for should be regarded as extra work done upon said contract. There does not appear to be any substantial disagreement between the parties in respect to the terms of the supplemental contract. The contractors, proceeding under the two contracts, began work about March 4, 1914, and continued until March 31, 1915, when it was ascertained that the amount of work performed which had been paid for in cash, in monthly payments, aggregated $159,000, being the full amount which was to be paid in cash. It was ascertained, by the engineers, that the total excavation to be made would be considerably in excess of the original estimates, and that, consequently, the contractors would ultimately have to be paid an amount in excess of the original contract price of $266,965.28, which excess would constitute extra work under the contract, which would be payable in cash. Complainant alleges that, at a meeting of the board of drainage commissioners, April, 1915, defendants, contractors, stated that they stood in need of money to pay balance due on equipment purchased for use in the work and requested that, in view of the fact that ultimately they would be entitled to be paid in cash for extra work, a considerable amount in addition to the $159,000 already paid, that the board would continue to make payments in cash for monthly estimates, until a sufficient amount was paid to cover the extra work which it was then known would be necessary, and to thereafter pay in the notes of the Southern Land Reclamation Company instead of first paying in such notes for work, to the amount of $107,965.28, as the board was entitled to do under the contract, and then paying in cash for the extra work. Defendants based their request upon the ground that it would amount to the same thing in the end and enable them to meet the payments on their equipment. The board of drainage commissioners consented to grant this request. Defendants deny this allegation and say that the contract or agreement made during the month of April, 1915, was, on December 15, 1915, reduced to writing.

On November 20, 1915, the Southern Land Reclamation Company, complying with the statute of North Carolina, in such cases provided, changed its name to the New Holland Farms, Inc., which appears by reference to the certificate of the Secretary of State of North Carolina, dated June 10, 1916.

Complainant alleges that, in pursuance of the agreement of April 1915, the board of drainage commissioners continued to pay defendant cash, in monthly installments, in addition to the $159,000, paid in accordance with the original contract, until such additional cash payments amounted to the sum of $45,000, which it was estimated, and the board of commissioners avers, was sufficient to pay for all the extra work which would have to be done; that the board thereupon

paid to the contractors, in monthly installments, the notes of the reclamation company, which were accepted by the contractors, to the approximate amount of $61,000. Defendants admit the payment of cash, and notes, to the amounts alleged by the board of drainage commissioners. They deny that the notes were paid, or received pursuant to any parol agreement, as alleged, and say that said notes were delivered to the contractors pursuant to the original contract of July 16, 1913, "and not otherwise." They do not very clearly say for what work the monthly cash payments were made, but deny that it was sufficient to pay for all extra work done and to be done, and allege that the work yet remaining to be done is extra work, and if completed, will require, in compensation, an amount or sum in excess of the amount of notes executed by the reclamation company, by the sum of $20,000. Complainants allege that, in making the cash payments of $45,000, they did not do so in the exercise of their option under the contract to pay in cash any part of the original contract price which was payable in notes, but paid the same at the request of the defendants to accommodate them, and on account of the extra work which complainants found would be necessary and in reliance upon the understanding that, if this was done, defendants would thereafter accept the notes of the reclamation company to the full amount stipulated in the contract for any work done. Defendants deny this allegation.

At the meeting of the board in September, 1915, defendants demanded payment for work on the boundary ditches and levees, in cash, on the ground that this was extra work, and refused to any longer accept notes therefor, and stated that they would not continue said work unless the board would pay for same in cash. This the board refused to do, and defendants thereupon stopped work on said boundary and levee ditches. This defendants admit to be true, giving at length their version of the transaction. The recital of these transactions is essential to an understanding of the questions presented for decision in this suit. At a meeting of the board of commissioners, December 15, 1915, defendants stated, as their reason for not accepting the notes of the reclamation company for work on the boundary levees and ditches, that they were doubtful whether said notes were valid when given in payment for extra work, whereupon the complainant board of drainage commissioners, the defendants A. V. Wills & Sons and the New Holland Farms, Inc., executed a contract in writing, in which it is recited that controversies have arisen in regard to the validity of the notes if delivered in payment of extra work and that the board of drainage commissioners and A. V. Willis & Sons, and the New Holland Farms, Inc., had agreed upon a settlement and compromise of the controversy. The New Holland Farms, Inc., agreed to execute such instruments of writing as will fully waive, and entirely eliminate, all questions as to the liability of said company, or its predecessor, the Southern Land Reclamation Company, for the notes which may be delivered by the board of drainage commissioners in payment for extra work done by the contractors in constructing the drainage system in said district, and which will fully and effectually authorize said board of commissioners to give said notes in pay-

ment of such work, whether the same be extra work, or otherwise. The contractors, on their part, agreed to resume work upon the boundary ditches and levees of said district on or before the 1st day of January, 1916, and to prosecute the same diligently until completed, and to accept, in payment, for said work, or any other work, done for said board of commissioners in said district, the notes of the New Holland Farms, Inc., or its predecessor, the Southern Land Reclamation Company, duly and properly secured in the manner provided in the contract of July 16, 1913, until the said notes so accepted, together with such notes heretofore accepted by them, shall. at 90 cents on the dollar, pay for work to the amount of $107,965.28, and the board of commissioners agreed that, after the notes to said amount have been accepted, they will pay for all additional work, in cash.

Pursuant to this agreement, or contract, and for the purpose of assenting to and ratifying the execution thereof by its president, the board of directors of the New Holland Farms, Inc., met on December 21, 1915, and adopted a resolution reciting the facts set forth in said contract, and reciting, further, that it was greatly to the interest of the said New Holland Farms, Inc., the successor of the said reclamation company, that the drainage work shall be fully completed as early as possible. D. N. Graves, president, was authorized and directed to execute, for the company, in writing, an agreement that the company will waive any objection to the payment of the notes delivered to the contractors by the board of drainage commissioners for extra work and to full authorize said board of commissioners to deliver to the contractors any or all of said notes secured by said deed of trust in payment for extra work as aforesaid, and to fully approve and ratify the action of the board of drainage commissioners in delivering and paying said contractors for extra work the notes held by them under said contract of July 16, 1913. The resolution further authorized its president to covenant and agree for the company that any and all of said notes, which may have been delivered to the contractors in payment for extra work, in said district, shall be as valid and binding upon the corporation, and remain as fully secured by the deed of trust as if the same had been paid for regular work under the contract, etc.

The contractors, on January 1, 1916, pursuant to the terms of said agreement of December 15, 1915, resumed work and continued, until February 18, 1916, accepting the said notes to the amount of $8,000, when they again refused to further accept said notes. They stopped said work and refused to resume or continue the same, and assigned as their reason therefor:

(1) That by reason of the terms and provisions of the contract of July 16, 1913, the board of drainage commissioners have no power to deliver any of said notes to the contractors in payment of extra work, and that such notes, if delivered for such purpose, are not the valid and binding obligations of the Southern Land Reclamation Company, nor are they secured by, nor do they come within the provisions of, the deed of trust executed by the said reclamation company to Dunham and Laird, trustees, and that, to the extent of such of said notes as are, or may be hereafter, delivered to the contractors for extra

work, said deed in trust is not the first lien upon the land conveyed therein.

(2) That if the Southern Land Reclamation Company had the power to waive the terms of the contract, the New Holland Farms, Inc., its successor, did not have such power, and that therefore the action of its president in executing the contract of December 15, 1915, and its board of directors of December 21, 1915, ratifying and approving same, and giving to its president power to assent to and validate the delivery of the notes for extra work, was invalid as to said notes. A copy of this resolution was sent to the contractors.

Defendants further allege that, on December 1, 1915, the New Holland Farms, Inc., executed a deed of trust to the Federal Trust Company of Boston, Mass., for the purpose of securing the payment of a bond issue, made by said New Holland Farms, Inc., of $500,000, conveying the same land, included in the deed of trust, to Dunham and Laird, trustees, together with a large body of other lands owned by the said New Holland Farms, Inc., and being the same land referred to in the supplemental contract made by the Southern Land Reclamation Company and the contractors of July 16, 1913; that said deed of trust was registered in the office of the register of deeds of Hyde county, December 9, 1915. The Federal Trust Company was, by an order in this cause, made a party defendant and, upon process duly served upon it, filed its answer. The full amount of the bonds, $500,-000, secured by the deed of trust to the Federal Trust Company, was issued, and $28,500 were marketed on May 25, 1916.

The controversy between the parties is, therefore, whether such of the notes, executed by the Southern Land Reclamation Company, secured by the deed of trust to Dunham and Laird, trustees, and deposited with the board of drainage commissioners, pursuant to the terms and provisions of the contract of July 16, 1913, and the modification thereof, as have been delivered, or may hereafter be delivered to the contractors, pursuant to the contracts made subsequently thereto, for extra work, are as against the New Holland Farms, Inc., valid and binding obligations, and whether, as against the defendant Federal Trust Company, and the purchasers of the bonds, secured by the deed of trust to said company, such notes are secured by the deed of trust to Dunham and Laird, trustees, and constitute the first lien on the land conveyed in said deed of trust.

If these questions are answered affirmatively, other questions regarding the rights and remedies to which the parties may be entitled, upon the facts appearing in the record, will be presented. If they are answered in the negative, the complainants are not entitled to any relief in this suit.

Defendants' answer suggests a number of questions in regard to the power of the board of drainage commissioners to enter into the several contracts; the execution of the Dunham and Laird trust deed, etc. I do not perceive any difficulty in either respect. There are also suggestions of a want of bona fides on the part of complainants. The record and evidence discloses good faith on the part of all per-

sons concerned, and a desire to carry out the obligations assumed by them.

[1] While not strictly in the order in which it is presented in the pleadings, it is convenient to inquire what, if any, effect upon the powers of the corporation was wrought by the change in the name of the Southern Land Reclamation Company, to the New Holland Farms, Inc. The New Holland Farms, Inc., is referred to in the pleadings as the successor of the reclamation company. This is not accurate. The corporation, pursuant to the provisions of Rev. N. C. 1905, c. 21, § 1175, simply amended its charter by changing its corporate name and increasing its capital stock. It remained, and continued to be, the original corporation, with all of the powers and liabilities possessed and assumed prior to the amendment; it was, in no legal sense, a new corporation, and therefore was not "the successor" of the reclamation company, but is the same corporation with another name.

It will be observed that, in the deed of trust executed to Dunham and Laird, trustees, no reference is made to the contract of July 16, 1913, nor to the disposition of the notes; it simply describes the notes, and conveys the land upon the trust declared, to secure their payment with power of sale in the trustees, upon default, etc. The trustees are not brought into, or made parties to, the contract.

[2] Defendants suggest that the execution of the deed of trust by the reclamation company to Dunham and Laird, trustees, was not proven in accordance with the provisions of the North Carolina statute. An examination of the certificates of probate, made before a notary public of the state of Massachusetts, evidenced by his notarial seal, discloses that the president and secretary of the corporation, each in his official capacity, acknowledged his signature, and that the deed was "the free act and deed of said corporation." While not so full as the form prescribed by the statute (Pell's Rev. 1908, c. 18, § 1005) which, it is declared, "shall not exclude other forms of probate," the certificate shows the essential facts that each officer signed the deed, affixed the seal, and declared it to be the act and deed of the corporation. In Witherell v. Murphy, 154 N. C. 82, 69 S. E. 748, discussing the form of probate of the deed of a corporation, it is said that, when the essential facts appear, by reading the deed in connection with the certificate, that the officer was authorized to execute that instrument for the corporation, that he was known, or proved to the officer, to be the corporate official he represented himself to be, and that he acknowledged the instrument to be the act and deed of the corporation, it is sufficient, and that a substantial showing of the requisite facts is all that is required. To one familiar with the large number of cases which have come before the courts of this state in which deeds have been attacked, and valuable property rights endangered, by critical construction of statutes, prescribing the manner in which deeds shall be admitted to probate and certified for registration, followed by "curative acts," it is reassuring to find that the courts have adopted Prof. Wigmore's suggestion that they should cease to be pedantic and become practical. The probate was

passed 'upon and approved by the probate officer of Hyde county and duly registered. The reclamation company has repeatedly and solemnly acknowledged and recognized its validity. The deed to the Federal Trust Company expressly refers to it, giving book and page in which it is recorded. It is difficult to understand why any parties to the deed should. now attack its validity, in respect to its execution and registration. .I do not entertain any doubt of its validity in either respect.

[3] Eliminating, for the present, the deed of trust executed to the Federal Trust Company, and treating the question as between the board of drainage commissioners, the Southern Land Reclamation Company, and A. V. Wills & Sons, it is difficult to perceive any reason why they did not have ample power to make the change providing that, for the reasons stated, the notes should be delivered in payment for extra work, and the whole of the other work be paid for in cash. This agreement, although not then reduced to writing, was made before the rights of any other party had attached. The change was made for manifestly good reasons and, at the request of the contractors, to enable them to receive cash for work to pay for their equipment. It did not increase the indebtedness of the reclamation company, nor divert any of its funds to other than the primary ·purpose for which the company was organized and the contracts made, the drainage of the lands within the drainage district, a work of large public interest and for the benefit of the reclamation company and other landowners within the territory. Although, for manifest reasons, the notes were to be delivered in monthly installments, and to become absolute obligations from the date of their delivery, when so delivered, pursuant to the terms and provisions of the contract of July 16, 1913, they were within the provisions of, and secured by, the deed of trust executed for that purpose. Certainly there can be no doubt that a court of equity would compel their payment by the trustees from the proceeds of a sale of the property, although the parties to the contract had, for a valuable consideration, agreed upon the change in the manner of their application. In other words, as between the parties, and for the purpose of effectuating their intention, the contract of July 16, 1913, the trust deed of July 26, 1913, and the agreement of December 15, 1913, would be construed together and their provisions enforced.

[4] Defendants\ insist that, conceding this to be true, the execution of the deed of trust to the Federal Trust Company, registered December 9, 1915, creates a lien or incumbrance on the property, prior to the deed of trust to Dunham and Laird as to notes delivered subsequent to December 9, 1915.

Plaintiff, in the eighteenth paragraph of its bill, sets out the language found in the deed of trust to the Federal Trust Company, in the covenant against incumbrances, excepting from its terms "a mortgage given by the Southern Land Reclamation Company upon certain of the aforesaid premises to C. E. Dunham and C. T. Laird, trustees, which mortgage is dated July 26, 1913, and is duly recorded in said Hyde county, registry of deeds, Book No. 13 of Mortgages,

p. 247, and which mortgage is given to secure the sum of $119,965.42 and interest," and alleges that:

"They are advised and aver that the first deed of trust securing the said notes of the Southern Land Reclamation Company to the defendants is a prior lien upon the land therein described to that of the aforesaid second deed of trust, and that such priority of lien extends to all the notes therein described in the hands of the board of drainage commissioners, or elsewhere, without regard to when they, or any of them, may be delivered by said board to defendants in payment for said drainage work or whether for extra or original work."

The defendant Federal Trust Company, answering this paragraph of the bill, says that:

"It is advised by counsel that, as matter of law, the deed of trust held by it as security for said bonds is subordinate to the lien of said mortgage given by the Southern Land Reclamation Company to C. E. Dunham and C. T. Laird, trustees, for the benefit of the defendants A. V. Wills, M. V. Wills, and E. S. Wills, partners trading as A. V. Wills & Sons, to the extent of notes issued, or to be issued, thereunder to the amount of $119,965.42, without regard to the date of delivery thereof, and it therefore admits the allegations of paragraph 18 of said bill."

It is true that the averment, made by plaintiff, is a mixed question of fact and law; but it is an allegation that the deed to the trust company is subordinate to the deed of trust to Dunham and Laird, trustees, and expressly avers that the priority of lien extends to all of the notes, whenever delivered, and whether for extra or original work—thus expressly calling attention to the question raised by defendants, contractors, and this the Federal Trust Company admits to be true. It would seem that this admission, made in a suit in which the validity of the notes delivered subsequent to the execution of the deed of trust for extra work is the very question in controversy, would, in a court of equity, estop it from again bringing the question into litigation. Passing, however, the effect of the admission as to the defendant Federal Trust Company, the question is presented whether it was not correctly advised as to its relation to the Dunham and Laird trust deed, as matter of law. Defendants, contractors, base their contention to the contrary upon several grounds. They insist, first, that the deposit of the notes with the drainage commissioners is not a valid deposit in escrow, because the members of the board, or some of them, are the same persons as the corporators of the reclamation company. This contention is without merit. The board of drainage commissioners is a body corporate created by an act of the Legislature, with ample powers to make and execute the contract, and to receive the notes to be delivered according to its provisions. Upon failure to do so, it would be subject to a mandamus to compel the discharge of the duty. The Reclamation Company, under its name of adoption, the New Holland Farms, Inc., is a corporation distinct from its stockholders, with power to make and perform its contractual obligations. Neither of these corporations are making any point in regard to their power or duty to perform the duties assumed by them; on the contrary, they are insisting upon performing, in good faith, their contracts. The contractors have re-

ceived from them, in part performance of the contracts, $200,000 and notes to the amount of about $70,000. It is difficult to see why they now wish to invalidate the contracts into which all parties entered and in the completion of which they are all so largely interested.

. Defendants, contractors, however, insist that, conceding the validity of the contract of July 16, 1913, and the deposit of the notes in escrow, they become valid and binding obligations only from the date of their delivery, and that the execution of the deed of trust to the Federal Trust Company and issue of the bonds secured therein constitutes a first lien or incumbrance on the land quoad all of the notes thereafter delivered. Defendants argue that the situation is analogous to that of a mortgage given to secure advancements to be made subsequent to its execution; that, as against a second mortgagee, the first mortgage is security only to the extent of advancements made prior to its registration, or other notice of its execution. They cite a large number of cases in which the courts have so held. In Shirras v. Caig, 7 Cranch, 34, 3 L. Ed. 260, a mortgage was executed for the purpose of securing future advancements. The land covered by the mortgage was thereafter conveyed to a third party. Upon a bill to foreclose, Chief Justice Marshall held that the mortgage was valid, as security for all advances made before actual notice of the execution of the second deed. Todd v. Outlaw, 79 N. C. 235. The courts have, with practical uniformity, followed this decision, when the mortgagee was under no contractual obligation to make any, or a fixed amount of, advancements; it being optional with him to make, and with the mortgagor to call for, the advancements. These decisions are based upon sound reason and wise policy. When, however, the mortgagee, either by the express terms of the mortgage, or by cotemporaneous contract, comes under an obligation to make advancements to the amount fixed in the mortgage, a different question is presented. This distinction is clearly made in Hyman v. Hauff, 138 N. Y. 48, 33 N. E. 735, it is held that when the mortgagee is bound to make the advancements, the lien relates back to the date of the mortgage, and is superior to subsequent liens. Boswell v. Goodwin, 31 Conn. 74, 81 Am. Dec. 169.

The modern view of the question is stated by the author of Jones on Mortgages (6th Ed. § 373):

"There is strong reason and authority for the rule that a mortgage to secure future advancements which, on its face, gives information enough as to the extent and purpose of the contract, so that any one interested may, by ordinary diligence, ascertain the extent of the incumbrance, whether the extent of the contemplated advances be limited, or not, and whether the mortgagee be bound to make the advances or not, will prevail over the supervening claims of purchaser or creditors, as to all advances made within the terms of such mortgage, whether made before or after the claims of such purchasers or creditors arose, or before, or after the mortgagee had notice of them. If the mortgage contains enough to show a contract between the parties that it is to stand as a security to the mortgagee for such indebtedness as may arise from future dealings between the parties, it is sufficient to put a purchaser or incumbrancer on inquiry, and, if he fails to make it, he is not entitled to protection as a bona fide purchaser."

While it is not necessary, in this case, to invoke the opinion of the learned and accurate author to the extent to which it leads, it is of value as indicating the trend of the judicial mind on the subject. Of course, the validity of all mortgages, as security for future advances, depends upon the bona fides of the parties; they will not be sustained as against creditors and other incumbrancers unless this appears. The conditions with which we are dealing are, to some extent, analogous to those existing in Diggs v. Fidelity & Deposit Co., 112 Md. 50, 75 Atl. 517, 20 Ann. Cas. 1274. There, a deed of trust was executed to secure a bond issue; a portion of them were deposited with the trustee to be delivered to the purchaser of after-acquired property, and for betterments and improvements to the plant, upon the certificate of engineers. The court said that:

"Neither the form nor scheme of the gas company's mortgage is of doubtful validity or unusual in character. It has been settled by decisions in this state and elsewhere that an owner of property may, by a deed of trust in the nature of a mortgage, subject it to a lien for the payment of future debts or obligations."

It would be impracticable to conduct the numerous and large transactions, involving the construction of railroads, development of the natural resources of the country, etc., unless the courts recognized and protected rights acquired by the means adopted by the parties in this instance, which, as said by the court, are "not unusual."

It is doubtful whether the deed of trust to Dunham and Laird and collateral contract pursuant to which the notes were deposited with the board of drainage commissioners can be properly called a mortgage to secure future advances. The contractors, for a valuable consideration, came under a binding and enforceable contract, with the board of commissioners, to do the work, the character and extent of which was definitely fixed, for the sum of $266,955.28, and the board of commissioners came under a binding obligation to accept the work and pay for it, in the manner and upon the terms set out in the contract. The deposit of the notes was made in furtherance of the scheme or plan agreed upon by the parties. The postponement of the delivery of the notes and the duty to deliver them as the work progressed were definitely fixed and capable of enforcement, or recovery of damages for failure or refusal to perform the obligation of the contract by either of the parties. The registration of the deed of trust, reciting the amount and denomination of the notes, payable to the contractors, gave full notice to subsequent incumbrancers of the character and amount of the debt. The terms and conditions upon which the notes were to be delivered did not change or affect the amount or character of the incumbrance. In addition to the registration of the deed of trust to Dunham and Laird, the deed of trust to the Federal Trust Company expressly refers to and is made subject to the first deed. It is settled by abundant authority that a grantee is estopped to deny the validity of a mortgage which his deed recites that the conveyance to him is subject. Johnson v. Thompson, 129 Mass. 398.

In Am. Waterworks Co. v. Farmers' Loan & Trust Company, 73 Fed. 956, 20 C. C. A. 133, Judge Thayer says:

"The New Jersey company (the purchaser of the property), we think, is estopped from asserting the invalidity of the mortgages executed by its predecessor, the Illinois company, by virtue of the well-established rule that a purchaser of property who accepts a conveyance thereof which described incumbrances existing thereon, and expressly declares that the conveyance is made subject thereto, will not be allowed to question the validity of such incumbrances."

This principle is well settled and illustrated by numerous adjudged cases. In this case the Federal Trust Company, by its answer, recognizes and admits the validity of the notes and priority of the lien created by the deed of trust to Dunham and Laird, trustees, without regard to when the notes, or any of them, may be delivered by the board of drainage commissioners to the contractors in payment for the drainage work and whether for extra or original work. It would seem that, in any view of the case, the deed of trust to Dunham and Laird, trustees, is valid and constitutes a valid first lien on the property conveyed as security for the notes without regard to the time of their delivery. Such delivery is simply the discharge of the obligation assumed by the terms of the contract, executed cotemporaneously with the deed of trust. The purpose which the law contemplates for requiring registration, notice of the character and amount of, the incumbrance on the land, to creditors and subsequent incumbrancers, is fully accomplished.

Defendants, contractors, insist that, if this be conceded, the change in the terms of the original contract, by which the notes are appropriated to the payment for extra work, invalidates the priority of the lien as against the Federal Trust Company. Here again the trust company solemnly admits, with knowledge of the change, that the deed of trust executed to it is subordinate to the lien, securing the notes, without regard to the time of delivery, or the character of the work to the payment of which they are applied. Conceding that a change in the original contract, which increased the amount of the debt, or appropriated the notes to an object foreign to that originally contemplated, or which was otherwise prejudicial to the rights or interest of the trust company, or the bondholders, would postpone the lien to that of the Federal Trust Company, it is difficult to see how either of these results follow from the application of the notes to the payment of extra construction work on the property covered by both deeds of trust. It is manifest, and must have been well known to, and understood by, all parties interested, that the value of the property was dependent upon its successful drainage. It was contemplated, and set forth in the contract, that, as is usual in work of that character, it would be necessary that extra or work in addition to the original plans and specifications would be necessary. The change in the contract, made in accordance with the request, and to meet the conditions presented by the contractors, was in furtherance of the scheme or plan of drainage and for the promotion of the interest of all parties. It did not increase the amount of the notes, change their character, or expedite the time of their maturity. It is difficult to see how the change prejudiced the interest of the Federal Trust Company. Questions of this character should be dealt with by the court in the light in

which they are understood and dealt with by the parties who are practical business men. Strained and narrow construction should not be put upon contracts entered into for the purpose of promoting and accomplishing valuable and important results. Courts should endeavor, unless bound by rigid statutes, to preserve rights, and not destroy them. This is especially the duty of courts of equity, in which decrees may be so molded as to conserve and protect the rights of all parties before them. From this viewpoint, recognizing the right of the contractors to insist upon the validity and first lien for the security of the notes to be taken in part payment for the work done by them, they should not be permitted to be released from their agreement to accept the notes for extra work upon technical and unsubstantial objections. The delay on the part of the New Holland Farms, Inc., in having its officers to execute the paper, waiving all questions in respect to the validity of the notes and in executing the deed of trust to the Federal Trust Company, was calculated to create in the minds of the contractors an apprehension that the security held for the notes might be postponed. The course pursued by the Federal Trust Company shows that all parties are acting in good faith and are recognizing the validity of the notes and priority of the lien by which they are secured.

[5] There is, however, another phase of the case, in which I concur with the views advanced by the defendants, contractors, and which will place the security for, and payment of, the notes beyond any question. It will be observed that the reclamation company, New Holland Farms, Inc., by adoption of this name, is the owner of some 99,000 acres of land, including the 13,511 acres covered by the Dunham and Laird deed of trust. The reclamation company entered into a contract, cotemporaneous with the execution of the original contract and deed of trust to Dunham and Laird, trustees, and the notes to the contractors, whereby it obligated itself that, if before the completion of the work and the payment of the notes it sold any of this land, not included in the deed of trust to Dunham and Laird, trustees, for cash, or on credit, it would deposit one-half of the cash received from such sale, and one-half the "purchase notes" taken for such land sold on credit, with some bank to be agreed upon by the parties, to be applied to the discharge of such of the notes as were outstanding. The deed of trust to the Federal Trust Company covers not only the 13,511 acres, included in the Dunham and Laird trust deed, but the entire 99,000 acres. Defendants contractors insist that the execution of the deed of trust to the Federal Trust Company, and sale of the bonds secured thereby, come within the meaning and spirit of the collateral contract and constitute a sale of the land, entitling them to demand that one-half the proceeds of the bonds when sold be deposited with some bank to be agreed upon and applied to the payment of the notes, as provided by the contract.

Complainant, in reply to this contention, insists that the execution of the deed of trust is not a sale within the meaning of the contract. It is manifest that in executing the collateral contract, cotemporaneous with the original, it was the purpose and intention of the parties to strengthen the security of the notes, and to render their payment abso-

lutely certain in the event that any portion of the lands owned by the reclamation company were sold. This purpose would be defeated if the reclamation company, now the New Holland Farms, Inc., should be permitted to place the entire property beyond its control, by subjecting it to a lien for $500,000, and thereby deprive the contractors of any of the benefits or security which accrued to them under the collateral contract. To hold that the meaning of the word "sale," as used in the contract, is restricted to an absolute sale, would be to keep the promise to the ear and break it to the hope; it would be too narrow. A "mortgage" is usually defined to be a sale, with a clause of defeasance, or a condition annexed, upon the performance of which the title revests in the owner. While it may be conceded that the word "sale" does not, in many instances, include a mortgage, such meaning will be given to it when necessary to effectuate the manifest purpose and intention of the contracting parties. There is no evidence in this record as to the value of the entire holdings of the New Holland Farms, Inc., but it is evident that their value is, to a large extent, dependent upon their drainage and bringing them under cultivation. The issuance of bonds to the amount of $500,000, with notes for $119,-965.42 outstanding, may result in the absolute sale of the lands for their payment. It is a familiar maxim in equity, based upon principles of fair dealing, that he who asks equity must do equity. It will be observed that the collateral contract provides that the amount of cash or "purchase notes" deposited from the sale of the lands shall not exceed the amount of the notes outstanding; hence, under the terms of the contract, the amount which will be deposited from the sale of the bonds would not, under any conditions, exceed $125,-000, or one-fourth the amount of the bonds. The decree will provide for the performance by the complainant of the obligations of the collateral contract.

[6] The question which has given most anxious concern relates to the character and extent of the relief to which complainants are entitled. They allege: That, in accordance with the obligation assumed under the original and amended contract, they have paid to the contractors the full amount in cash and notes due them for work performed as per estimates of the engineers, made in accordance with the provisions of the contract, and that they are unable to make further cash payments thereon. That the contractors knew, at the time of making the contract, and at the time of making the request for the change therein, and the agreement made in pursuance thereof, that complainants had no cash with which to pay for the work other than the amount paid them and were relying upon the acceptance of the notes. That it would be difficult, if at all practicable, for complainants to procure other contractors to take up and complete the construction of the boundary and levees and ditches, because in addition to the absence of cash, or the means of raising the same, and because of the fact that it requires the preparation of special equipment, which few contractors possess, and with which defendants, contractors, have provided themselves, and the large costs of which was calculated and included in the price fixed for the entire contract. That one of the main pur-

poses for which the boundary levees and ditches are constructed is to keep out the water which overflows into said district from the Alligator river, a large tributary of Albermarle Sound, in time of high winds. That, unless the said boundary levees and ditches are completed as early as possible, there is danger that such overflow will occur and seriously injure the very large amount of work already done, whereby complainants and the large number of other landowners in said district will be irreparably damaged. That the large damage sustained by complainants by the failure of defendants to perform their conduct will damage complainants in a large amount, which damage would be irreparable and difficult to measure and ascertain. That there are 587 landowners, within said drainage district, each of whom would be substantially damaged by the failure of defendants, contractors, to complete the work in accordance with the contract, and suits by each of them for the recovery of such damage would cause a multiplicity of actions involving large costs, and the damage sustained by each would be uncertain and difficult to ascertain. That, at the time defendants entered into the contract, they executed a bond in the sum of $66,741 for the faithful performance of said work, but said bond was limited to two years and has expired by limitation, so that complainants now have no bond from which they could recover damages for the failure to perform the contract by defendants. That defendants are nonresidents and have no property or assets in this state other than the dredges, tools, and equipment employed in this work. The time fixed for completion of the contract, 30 months from its date, has expired. That complainants are ready, willing, and able to make payment for the work by defendants upon monthly estimates of the engineers, by the delivery of said notes in accordance with the terms of the contract at 90 cents on the dollar, until the work so paid for shall amount to $107,965.28 and to pay for any work in excess of that amount in cash.

They pray that the court will adjudge all of said notes to be a first lien on the land conveyed in the deed of trust to Dunham and Laird, trustees, without regard to the time they are delivered, or whether for original construction, or extra work; that defendants, contractors, be required to resume and complete said drainage work, and to accept said notes in accordance with the terms and provisions of the contract, as modified, etc.; that a mandatory injunction issue commanding defendants contractors to resume and continue the performance of said work until completed, etc.

Defendants, in their answer, allege that they have always been willing to resume the work and complete the same and accept the notes in payment thereof, if they were assured that the deed of trust given to Dunham and Laird, trustees, to secure their payment, constituted a valid first lien upon the land conveyed therein. Defendants make a number of allegations in regard to the conduct of the board of drainage commissioners, many of which are not relevant to the matter in controversy. On the hearing, upon complaint and answer, the foregoing facts were not seriously contested.

Defendants insist that, conceding the notes to be valid and the deed

of trust, given to secure their payment, the first lien on the land conveyed therein, complainants are not entitled to the relief prayed, or to any other relief in this suit.

We are thus confronted with a question which has given courts of equity anxious concern and in regard to which the decisions are not uniform. While complainants ask the court to issue a mandatory injunction commanding defendants contractors to proceed with and complete the work which they contracted to perform, it is manifest that the court is called upon to decree specific performance of an executory contract, involving labor, personal skill and judgment, extending over an uncertain period of time. Courts of equity proceed with caution in decreeing specific performance of contracts of the character with which we are dealing in this case. Prof. Pomeroy says:

"In general the specific performance of these contracts will not be decreed because the court cannot, by its ordinary means and instrumentalities, enforce its decree."

He says that the English courts hold that, "when the agreement to erect a building is defined and certain," the general rule will not be enforced. Eq. § 1403 notes.

In a well-considered note to Leonard v. Board of Directors (79 Ark. 42, 94 S. W. 922) 9 Ann. Cas. 159, after stating the general rule, followed by citation of numerous cases, it is said:

"While the general rule is well recognized that the performance of a contract to build or to construct any work will not ordinarily be decreed specifically in equity, many exceptions to the rule have been made by the courts."

In Jones v. Parker, 163 Mass. 564, 40 N. E. 1044, 47 Am. St. Rep. 485, an agreement to put in a house a heating and lighting apparatus, it appearing that there was no difficulty in arriving at the manner in which the work was to be done was enforced, it was said:

"There is no universal rule that courts of equity never will enforce a contract which requires some building to be done."

In Union Pac. Ry. Co. v. Chicago, etc., Ry. Co., 163 U. S. 564, 600, 16 Sup. Ct. 1173, 1187 (41 L. Ed. 265), Chief Justice Fuller says:

"The jurisdiction of courts of equity to decree the specific performance of agreements is of a very ancient date, and rests on the ground of the inadequacy and incompleteness of the remedy at law. Its exercise prevents the intolerable travesty of justice in permitting parties to refuse performance of their contracts at pleasure by electing to pay damages for the breach."

Referring to the contract involved in that case and the objections urged to the courts decreeing specific performance, the Chief Justice says:

"It is not contended that multiplicity of suits to recover damages for the refusal of defendants to perform would afford adequate relief, nor could it be, for such a remedy under the circumstances would neither be plain nor complete, nor a sufficient substitute for the remedy in equity, nor would the interests of the public be subserved thereby. But it is objected that equity will not decree specific performance of a contract requiring continuous acts involving skill, judgment, and technical knowledge, nor enforce agreements to arbitrate, and that this case occupies that attitude. We do not think so. The decree is complete in itself, is self-operating and self-executing, and the

provision for referees in certain contingencies is a mere matter of detail and not of the essence of the contract. It must not be forgotten that, in the increasing complexities of modern business relations, equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies 'so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated,' and 'has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition in which new primary rights and duties are constantly arising and new kinds of wrongs are constantly committed.'" Pom. Eq. Jur. § 111; Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843.

Mutuality of obligation is one of the essential elements required by the courts when specific performance is asked. Here, this element is manifest. Complainant not only admits its obligation to pay, but avers and shows its ability and willingness to do so in accordance with the terms of the contract, which are fixed and certain in respect to price, time, and conditions. The terms of the contract, in respect to the kind, character, extent, and quality of the work to be done, are all fixed. The payments are to be made monthly upon estimates made by the engineers, as provided by the contract and selected by the parties. There is no complaint or suggestion that, in the work heretofore done and paid for, constituting the larger part of the entire work contracted for, the engineers have not discharged their duty promptly and satisfactorily to all parties. The requirement that the terms of the contract shall, in all respects, be fixed and certain, is fully met in this case. It clearly appears that no substantial difference of construction or opinion has arisen between the parties in either respect. The means of payment—the notes—fixed by the contract have been executed and their security provided; the depository is ready, able, and willing to deliver them in accordance with the terms of the contract. It is a well-settled rule that the court will not decree specific performance if damages for its breach afford a complete and adequate remedy—this is basic. In regard to this requirement, it is said:

"The jurisdiction does not depend upon the nature of the contract, nor of the subject-matter, but it will be exercised whenever the legal remedy is inadequate. * * * The ground of jurisdiction includes two classes: * * * (2) When, from some peculiar feature of the contract, either in its subject-matter or in its terms, or in the relation of the parties, it is impossible to arrive at a legal measure of damages at all, or at least with any sufficient degree of certainty." Pom. Eq. 1402, 1403.

It is quite evident that, without regard to the residence of defendants, contractors, in the state of Illinois, or the kind or value of property owned by them in this state, the character and purpose of the work to be performed and the property to be affected by its completion renders it impracticable, if not impossible, to measure with any degree of certainty the damage sustained by the refusal of defendants, contractors, to perform the contract on their part. It appears from the contract, and the plans and specifications attached as a part thereof, and the geographical and topographical location and

·character of the section of the state in which "Mattamuskeet district" is situate, and the legislation providing for the drainage and reclamation of the lands therein, that large sums of money have been expended and obligations to a large amount have been assumed by the parties directly interested in their drainage for the purpose of bringing them under cultivation. It is manifest that if, in the present condition of the property and the work, the contractors should fail and refuse to continue and complete the portion of the work contracted to be done by them, much of the work already done would become useless, and that not only complainants but the large number of other landowners, who have assumed obligations and acquired rights, would be seriously, if not irreparably, damaged. Long drawn out, expensive suits at law, in which numerous and uncertain elements of damages would be involved, with uncertain results, both in respect to amount and ultimate recovery, strongly appeal to the court for equitable relief, if it can be granted without injury to either party.

"Specific performance is a conscious attempt on the part of the court to do complete justice to both the parties, with respect to all the judicial relations growing out of contract between them." Pom. Eq. § 1401, note.

Hence, the learned author says that damages are inadequate "when the subject-matter of the contract is of such a special nature, or of such a peculiar value, that the damages, when ascertained, according to legal rules, would not be a just and reasonable substitute for, or representative of, that subject-matter in the hands of the party who is entitled to its benefit." Section 1401.

It would seem quite clear that, in view of the character of the work to be done, the effect of the failure to do it, and the status of the parties, the case comes within the class in which courts of equity grant relief because of the inadequacy of the remedy afforded in a court of law.

Defendants, contractors, insist that the court should not decree specific performance because it would be impracticable for it to enforce the decree. This contention calls for careful consideration and examination of the decisions of chancellors dealing with contracts of this character. Defendants rely upon the case of Leonard v. Board of Directors, supra. In that case, the Supreme Court of Arkansas refused to entertain a bill for specific performance of a contract, in many respects similar to the one in controversy, placing its refusal on the ground that an action for damages for its breach afforded an adequate remedy, and that there was no way in which its decree could be enforced. The learned judge says:

"The jurisdiction of equity will not be exercised to decree a specific performance, however inadequate may be the remedy for damages, where the contract is of such a nature that obedience to the decree could not be compelled by the ordinary processes of the court."

It appears that the board of directors of the levee district were empowered to contract for the work of constructing a portion of the levee and pay therefor by borrowing money upon bonds which they were authorized to issue. After a portion of the work was done, they entered into a contract, with Leonard, to complete it and accept in

payment certificates of indebtedness. The contractor entered upon the performance of the work and thereafter abandoned it, refusing to continue on the ground that the board of directors was without legal authority to issue the certificates. The suit was brought to compel the contractor to complete the work and accept the certificates. The contractor demurred to the jurisdiction of the court to enforce specific performance. The court refused to pass upon the validity of the certificates and dismissed the bill. It does not appear from the statement of the facts set out in the bill whether the plans and specifications, by which the character and quality of the work were made certain, were a part of the contract. The court clearly put its decision upon the ground that it would be unable to enforce its decree for specific performance.

In Strang v. Richmond & P. C. R. R. Co., 101 Fed. 511, 41 C. C. A. 474 (C. C. A. 4th Cir.), the court refused to enforce specific performance of a contract to build a railroad. Judge Simonton says that the bill "alleges a contract between the complainant and the defendant company to construct, furnish, and build a complete roadbed between some point * * * in North Carolina, together with necessary depots, etc.; the work to be paid for in certain bonds," etc. He notes the uncertain termini of the road and the location of the depots, station houses, character of the bridges, the time within which the work is to be completed, the total absence of any particulars of the character of the work, the inspection of its progress, time and mode of payment, saying, "All these are left in a condition of vagueness and uncertainty."

In Solomon v. Sewerage Co., 142 N. C. 439, 55 S. E. 300, 6 L. R. A. (N. S.) 391, specific sperformance was refused because of the absence of mutuality of obligation, long period of time over which the contract extended, and other considerations set out in the opinion.

In Marble Co. v. Ripley, 10 Wall. 339, 358 (19 L. Ed. 955), it is said:

"Another serious objection to a decree for a specific performance is found in the peculiar character of the contract itself, and in the duties which it requires of the owners of the quarries. These duties are continuous. They involve skill, personal labor, and cultivated judgment. It is, in effect, a personal contract to deliver marble of certain kinds, and in blocks of a kind, that the court is incapable of determining whether they accord with the contract or not. The agreement being for a perpetual supply of marble, no decree that the court can make will end the controversy."

Several of these elements are not found in the contract with which we are dealing. In Texas Co. v. Cent. Fuel Oil Co., 194 Fed. 1, 114 C. C. A. 21 (C. C. A. 8th Cir.), several of the questions presented here are discussed by Judge Trieber in a well-considered opinion. It appears that complainants, operating an oil pipe line in Texas into Oklahoma, entered into a contract with defendant, which, through subsidiary companies, owned a number of leases, on which it operated wells, by which complainant agreed to extend its pipe line into the fields in which such wells were located in Oklahoma and make a connection with defendant's wells, and defendant agreed to run all of its oil into such line for a term of ten years, to be paid for by

complainant as provided for by the contract. Complainant built the extension of its pipe line at a large cost, and for a time received the oil from defendant's wells, after which defendant refused to make further deliveries. It further appeared that defendant was insolvent; that, without the oil contracted for, complainant's pipe line extension was comparatively valueless; and that it could not otherwise procure sufficient oil to keep its refineries in full operation. Judge Trieber, stating defendant's contention that because the contract in regard to deliveries of the oil extended over a period of ten years, etc., cites and discusses the cases relied upon to sustain defendant's position, several of which are cited in this opinion. Referring to Marble Co. v. Ripley, supra, he says:

"The contract sought to be enforced in this case runs for ten years only, and involves no 'skill, personal labor, and cultivated judgment.' What it does require is easily ascertainable, and, if carried out in good faith, ought not to give rise to any disputes requiring the interposition of the court. During the time it was complied with by appellee no disputes arose, and there is no reason for anticipating any now, if good faith will control the action of both parties."

The work which defendants agreed to perform was, by the terms of the contract, to be completed in 30 months. More than half has been completed and paid for. It would seem that, by comparison, it would not require to exceed 12 months to complete the balance of the work. The observations of Judge Trieber in regard to other phases of the case are very pertinent to the instant case. The case of Texas & Pac. Ry. Co. v. Marshall, 136 U. S. 393, 10 Sup. Ct. 846, 34 L. Ed. 385; is easily distinguishable from this case. After noting the facts in this and other cases relied upon by defendants, he refers to the fact that equitable remedies have steadily been expanded by the court to meet the increased complexities of modern business relations. In a number of cases specific performance of contracts between railroad companies and municipal corporations, or landowners, in which the companies, in consideration of rights of way, or other privileges granted, agreed to put in side lines, establish and maintain depots, etc., have been decreed. In Union Pac. Ry. Co. v. Chicago, etc., Ry. Co., supra, a contract in regard to the use of tracks was enforced. The Chief Justice, quoting the language used in Joy's Case, said:

"Here is a great public park, one of the lungs of an important city, which, in order to maintain its usefulness as a park, must be as free as possible from being serated by railroads; and yet the interests of the public demand that it shall be crossed by a railroad. But the evil consequences of such crossing are to be reduced to a minimum by having a single right of way, and a single set of tracks, to be used by all the railroads which desire to cross the park. These two antagonisms must be reconciled, and that can be done only by the interposition of a court of equity, which thus will be exercising one of its most beneficent functions." 36 Cyc. 587.

In Taylor v. Florida East Coast R. Co., 54 Fla. 635, 45 South. 574, 16 L. R. A. (N. S.) 307, 127 Am. St. Rep. 155, 14 Ann. Cas. 472, a contract by the defendant to establish and maintain a spur track and depot at a point fixed upon on plaintiff's lands, in consideration

of the grant of the land upon which its road was built, was specifically enforced. The conclusion reached is amply sustained in a well-considered opinion by Mr. Justice Whitfield. In Parrott v. A. & N. C. R. R. Co., 165 N. C. 295, 81 S. E. 348, Ann. Cas. 1915D, 265, it was held that a contract, based upon a valuable consideration, to maintain a flag station and side track, when not conflicting with its duty to the public, would be specifically enforced. The question was fully considered and authorities cited in the opinions filed. Johnson v. Ohio R. R. Co., 61 W. Va. 141, 56 S. E. 200.

While there is not a perfect analogy between any of those and other cases cited, and the instant case, they all indicate and illustrate the tendency of courts to extend the equitable jurisdiction to meet the conditions growing out of business and industrial life. To what extent the interest of the public demands the completion of the contract because of the large and valuable lands included within the Mattamuskeet drainage district, thus bringing the case within the principle announced in those cases, in which contracts made by railroad companies, is interesting. The board of drainage commissioners is a quasi public corporation with the right of eminent domain. It is in accordance with a long-established and well-settled public policy of this state to grant large quasi public powers to such legislative agencies, for securing the drainage of the fertile low lands of the eastern section of the state. The drainage districts established are quasi public corporations assimilated to public school districts, etc.

The defendants, contractors, in their answer, by way of further defense and as the basis for affirmative equitable relief, set up the supplemental contract, in which the reclamation company obligates that, in the event of a sale of its lands, it will deposit one-half the proceeds to be applied to the payment of the notes, and asks that specific performance of that contract be enforced for the payment of the notes now held by defendants. They allege that, on May 3, 1916, they served a written notice on complainant board of commissioners, setting forth that, if the notes were made valid and a first lien on the land, they were ready, able, and willing to carry out and execute their contracts; that they have, and are maintaining, in said drainage district, extensive equipment and plants for the doing of said work, at great expense to themselves; that they have been prevented from completing the work by reason of the default of the complainant; and that, unless complainant complies with its contract, they will move said equipment and hold the members of the board liable for damages, etc. They set out, at much length, the several contracts entered into, and allege that, for the reasons herein set forth, the notes to be delivered since the execution of the deed of trust to the Federal Trust Company will be invalid and will not be secured by a first lien upon the property. In the tenth paragraph of the "further defense," the defendants say:

"That the defendants A. V. Wills & Sons, parties being most vitally affected by this controversy, being desirous of having the said questions of law and equity involved therein speedily determined, and their respective rights and duties in the premises declared by the court, do submit the foregoing statement of facts for the opinion, decision, and judgment of the court thereon," reserving, of course, the right of appeal.

Defendants demand the dismissal of complainant's bill; that all notes, which have been delivered to them, for work performed under the contracts, be adjudged a first lien upon all of the lands of the Southern Land Reclamation Company and the New Holland Farms, Inc., lying in Mattamuskeet drainage district; that the deed of trust to Dunham and Laird, trustees, be adjudged, in all respects, valid and enforceable, both as to its form and probate; that all of the notes of the Southern Land Reclamation Company undelivered to the contractors and now in the possession of the board of commissioners of the drainage district be adjudged invalid, inoperative, and unenforceable; that they are not secured by a first lien either for extra or original work under the contract; that the complainants be ordered to raise the cash necessary to pay defendants to resume and complete all of said drainage work. Prior to the adoption of the new equity rules (rule 30 [198 Fed. xxvi, 115 C. C. A. xxvi]), this counterclaim would have been set up by a cross-bill. If complainant's bill was without equity, it would have been dismissed, and, if the cross-bill was sustained, a decree rendered upon it for defendants. Under the present rule, assimilating the practice to that of the Code of Civil Procedure, the same result is reached, not by dismissing the bill, but by making the decree upon the counterclaim.

It is manifest, from the counterclaim, that defendants are willing and desirous of completing the contract, if they can be assured of the validity of the notes and the priority of their lien. At the time the suit was instituted, defendants were not advised in respect to the attitude of the Federal Trust Company in regard to the subordination of its lien to that of defendants. It is manifest that the court cannot grant the relief prayed for by defendants and leave the complainants without remedy for the failure by defendants to complete the work. Both parties wish the completion of the work. Neither of them assert that there is any obstruction to this end other than the question of the validity and security of the notes. To dismiss the bill and thereby the counterclaim of defendants, notwithstanding the opinion entertained by the court, in regard to the validity and security of the notes, and the right of defendants to specific performance of the supplemental contract, would be trifling with the valuable rights of all parties. Both parties concede that they understand and do not differ in regard to the character of the work, the manner of its performance, or the condition upon which the price is to be paid. The court will not assume that they will not, in good faith, perform the requirements of a decree when their rights are declared and secured. Notwithstanding their insistence that the contracts are ultra vires, that the deed of trust to Dunham and Laird, trustees, is not valid, because of the alleged defective probate and registration, and that the notes are invalid, they ask the court, in their counterclaim, to adjudge that the contracts are valid, and that the deed is duly executed and probated, and that the notes delivered to them are valid and secured by a first lien upon the property conveyed to the trustee, in all of which, the court, for the reasons set forth, concurs with defendants. The court also concurs with them in respect to their right to have specific performance of the

supplemental contract. The court, for the reasons set forth, is of the opinion that defendants should enter upon and diligently continue to completion the work which they obligated to perform. Of course, defendants are entitled to a reasonable time within which to complete the work. This will be provided for in the decree. There are several other matters, referred to in the answer, collateral to the principal matter in controversy, which may, if necessary, be taken care of in the decree.

A decree will be drawn and submitted in accordance with the views expressed in this opinion. The costs will be divided equally between complainants and defendants A. V. Wills & Sons.