G. A. MYERS, E. M. COBB and L. R. CAMBRON, *Appellants,* v. JUSTIN VAN BUSKIRK, *Appellee.*

En Banc.

Opinion filed December 5, 1928.

706

*E. W.* and *R. C. Davis,* of Orlando, for Appellants.

*Dickinson & Dickinson,* of Orlando, for Appellee.

STRUM, J.—This is an appeal from a final decree awarding specific performance of a contract to convey lands.

The lands in question were owned by G. A. Myers, one of the defendants below. On April 15, 1925, Myers, as vendor, entered into a written contract with the complainant below, Justin Van Buskirk, by the terms of which Myers agreed to sell to Van Buskirk, and the latter agreed to buy, the lands in question, the total purchase price to be $7,750.00, payable $2,000.00 on delivery to the purchaser of warranty deed and abstract showing good title in the vendor, and the remainder at intervals thereafter. At the time of the execution of said contract of sale and purchase, a cash payment of $10.00 was made by the purchaser, Van Buskirk, to the vendor, Myers, and accepted by the latter as the consideration for his agreement to convey . This contract of sale was not recorded until November 19, 1925.

On July 1, 1925, Myers entered into a second contract with Marigold Belk and Elizabeth Cunningham, whereby he agreed to convey the same lands to Belk and Cunning-

ham for the total sum of $8,750.00, upon which contract a cash consideration of $100.00 was paid to Myers by Belk and Cunningham. This contract was recorded in the public records on July 1, 1925.

It appears that during the latter part of October, 1925, E. M. Cobb and L. R. Cambron, two of the defendants below, were desirous of purchasing the lands in question. Learning of the contract held by Belk and Cunningham, they employed an attorney to search the public records to determine the status of the title. The attorney made the search and reported that the record title in Myers was good except for several formal defects which were then being corrected by a suit to quiet title. The contract between Myers and Van Bushkirk, the complainant, had not yet been recorded. Neither Cobb nor Cambron, nor their attorney, then, nor at any time prior to November 19, 1925, had any notice, actual or constructive, of its existence.

After preliminary negotiations with Belk and Cunningham, and after being assured by Myers that he recognized the Belk and Cunningham contract as valid and would convey in accordance therewith, and knowing nothing of the Van Buskirk contract, Cobb° and Cambron on October 31, 1925, purchased the contract held by Belk and Cunningham, paying the latter a consideration of $5,000.00 in cash for their equitable interest in the lands under their contract. Belk and Cunningham on October· 31, 1925, executed a quit-claim deed whereby they "remised, released and quit-claimed" unto Cobb and Cambron all of their "right, title, interest, claim and demand" in and to said lands. This deed contained no words of conveyance and no covenants of warranty or otherwise.

Simultaneously, with the delivery to Cobb and Cambron of the quit-claim deed from Belk and Cunningham, on October 31, 1925, Myers executed a warranty deed bearing that date conveying the lands to Cobb and Cambron. This

warranty deed was delivered by Myers, the grantor, to the attorney for the purchasers, Cobb and Cambron, as their agent. The attorney testified that he was authorized by Myers to record the deed immediately, but did not do so because he feared he might complicate the suit, apparently brought by Myers, to quiet the title to the lands, which suit was then pending and in which a final decree had not yet been rendered. So that deed, as well as the quit claim deed from Belk and Cunningham, were with held from record for the time being. No money was paid by Cobb and Cambron to Myers upon delivery of the warranty deed, but Cobb and Cambron at that time delivered to their attorney a check dated October 31, 1925, for $3,000.00 to apply on the purchase price to Myers. This check was drawn by Cambron on the State Bank of Orlando, and was made payable to the Orange Bank & Trust Company, the bank with which Mr. Myers did business. This check, within a day or two, was turned over by Cobb and Cambron's attorney to the payee bank, with instructions that it was "to be delivered to Mr. Myers when E. W. and R. C. Davis (Mr. Myers' attorneys) had finished that title," referring apparently to the suit to quiet title. This form of transaction was apparently with the approval of Mr. Myers. It was clearly the intention of the parties that the proceeds of the check should not be paid over to Mr. Myers until a decree quieting the title in Mr. Myers had been rendered. The remainder of the purchase price was to be represented by promissory notes secured by a mortgage.

With affairs in this status, the original contract between Myers and the complainant Van Buskirk was recorded in the public records on November 19, 1925. On that day or the next the attorney for Cobb and Cambron, who was their agent in the transaction, learned that Van Buskirk claimed an interest in the lands, and upon inquiry and

immediate inspection of the public records found Van Buskirk's contract to be of record. So far as is disclosed by the evidence, this was the first notice, either actual or contructive, had by either Cobb, Cambron or their attorney of the existence of the Van Buskirk contract. The recording of the Van Buskirk contract on November 19, 1925, was, of course, constructive notice of its existence. Cobb and Cambron's attorney also received actual notice at about the same time, and from and after November 23, 1925, Cambron was also on actual notice of the prior contract, communicated directly and personally to him by Van Buskirk.

On November 30, 1925, Cobb and Cambron recorded their quit-claim deed from Belk and Cunningham and their warranty deed from Myers, both of which had been delivered to them on October 31, 1925.

Myers at all times remained in possession of the property; and was still in possession when ' this suit was brought.

Final decree in the suit to quiet title was signed by the chancellor on November 27, 1925, but was not recorded until during the month of January, 1926. The $3,000.00 check above mentioned was paid by the payee bank on either December 5th or 7th, 1925. Mr. Myers testified without contradiction, however, that he had never at any time received the proceeds of the check, and that he did not know what became of the notes and mortgage representing and securing the deferred payments; that he had never seen them and supposed they were in the bank. Why Myers did not receive the proceeds of the check is not made apparent by the testimony.

On December 4, 1925, the complainant Van Buskirk filed his bill of complaint against Myer, Cobb and Cambron seeking specific performance. The theory of the bill, as

amended on December 9, 1925, was that Cobb and Cambron received their conveyance from Myers "having full knowledge of complainant's contract with the said defendant Myers" and that complainant's contract should therefore be enforced against Cobb and Cambron in the same manner and to the extent as it could have been against their grantor Myers. See Drake Lumber Co. v. Branning, 66 Fla. 543, 64 So. R. 263; Drake v. Brody, 57 Fla. 393, 48 So. R. 978; Hammond v. Holz, 84 Fla. 1, 92 So. R. 874; Hall v. Northern & Southern Co., 55 Fla. 235, 46 So. R. 178; Tate v. Pensacola L. & B. Co., 37 Fla. 439, 20 So. R. 542; 25 R. C. L. 327; 27 R. C. L. 561, 686.

The chancellor found the equities to be with the complainant, Van Buskirk, and decreed specific performance in his favor upon certain terms set out in the decree. From that decree Myers, Cobb and Cambron appeal.

In solving the questions presented by the evidence, it should first be determined whether or not Cobb and Cambron, under either the warranty deed from Myers or the quit-claim deed from Belk and Cunningham, became *bona fide* purchasers so as to entitle them to protection as such against Van Buskirk's equity. If not, then Van Buskirk on the one hand, and Cobb and Cambron on the other, are in the attitude of holders of conflicting equities, and it must then be determined which of these equities should prevail.

We now consider the first phase of the matter.

One who has purchased and received a conveyance of the legal title in good faith, for value, and without notice, actual or constructive, of an agreement to convey previously entered into by the grantor with a third person, will be protected against such prior agreement. Kearnes v. Hill, 21 Fla. 185; Pomeroy Spec. Perf., Secs. 314, 464, *et seq.*; 25 R. C. L. 327; 27 R. C. L. 562. See also Rambo

v. Dickerson, 110 So. R. 352; Williams v. Neeld-Gordon Co., 86 Fla. 59, 97 So. R. 315; West Coast Lbr. Co. v. Griffin, 56 Fla. 878, 48 So. R. 36. If, however, a purchaser has notice, actual or constructive, of prior adverse rights in the land before he has paid the purchase price or has become irrevocably bound for its payment, he is not protected as a *bona fide* purchaser, even though he may have received a deed purporting to convey to him the whole title, both legal and equitable. Everdson v. Mayhew, 3 Pac. R. 641; Brown v. Welch, 18 Ill. 343; 68 Am. Dec. 549; Cranwell v. Clinton Realty Co., 56 Atl. R. 103; Balfour v. Hopkins, 93 Fed. 964; Hunsinger v. Hoffer, 11 N. E. R. 463; Pomeroy Eq. Jur., Sec. 691; 25 R. C. L. 327; 27 R. C. L. 703. See also Standard Oil Co. v. Mehrtens, decided at this term. Since the rule just stated is designed to promote the ends of equity and justice, its application in rare instances is subject to some qualifications when a strict application would defeat the underlying purpose of the rule. Henry v. Phillips, 124 Pac. R. 837; 31 Ann. Cas. 39; Lea v. Polk County Co., 21 How. (U. S.) 493; 16 L. Ed. 203. There is no occasion, however, in this instance for any relaxation of the rule.

Cobb and Cambron were charged with constructive notice of Van Buskirk's contract on and after November 19, 1925. Their attorney and agent had actual knowledge of its existence on and after that day or the next. Cambron also had actual personal knowledge on and after November 23, 1925. No payment was made by Cobb and Cambron prior to any of those times on account of the purchase price to Myers, if indeed any such payment has ever been made. Title to the proceeds of the $3,000.00 check drawn by Cobb and Cambron did not pass to Myers, and Myers was not entitled to receive the same, until the happening of an event, namely, the quieting of Myers' title, which

did not occur at the earliest prior to November 27, 1925. The check was not paid by the drawee bank until December 5th or 7th, 1925. Having received notice, both actual and constructive, of the existence of the Van Buskirk contract before they paid, or became irrevocably bound for, the consideration to Myers for the legal title, Cobb and Cambron can not claim protection as *bona fide* purchasers for value, as against Van Buskirk, under their warranty deed from Myers.

Neither are Cobb and Cambron entitled to protection as *bona fide* purchasers under their quit claim deed from Belk and Cunningham. The general rule, subject to some exceptions and qualifications, is that the purchaser of an equitable interest is not protected as a *bona fide* purchaser. The rules respecting a purchaser without notice are framed for the protection of one who purchases a legal estate and pays the purchase money, without knowledge of an outstanding equity. Starr Piano Co. v. Baker (Ala.), 62 So. R. 549. In order to claim the full protection of the rule as to *bona fide* purchasers, the purchaser must hold a legal title, or be entitled to call for it, for if his title be merely equitable, then it must yield to a superior equity in an adverse party. It has been frequently held that a purchaser claiming solely through an executory contract of purchase and sale is not a *bona fide* purchaser within the meaning of the rule. Taylor v. Weston, 20 Pac. R. 62; LaBelle Coke Co. v. Smith 70 Atl. R. 894; York v. McNutt, 16 Tex. 13; 67 Am. Dec. 607; 8 C. J. 1146, *et seq.* and cases cited; 27 R. C. L. 688.

Whether the quit claim deed of October 31, 1925, be regarded as an assignment of the equitable rights of Belk and Cunningham, or whether it be regarded as a deed of release of those right to Cobb and Cambron so that the latter might deal directly with Myers in purchasing the legal

title, the effect of the quit claim deed, in so far as the rights of Van Buskirk are concerned, was to put Cobb and Cambron in the identical position occupied by Belk and Cunningham. Cobb and Cambron became in effect assignees of the equitable rights of Belk and Cunningham. As against Van Buskirk, the fact that the assignment took the form of a quit claim deed, a pure deed of release, does not strengthen the situation of Cobb and Cambron as claimants under Belk and Cunningham. The grantee in a quit claim deed without words of conveyance and without covenants, a mere deed of release, occupies the same position as did his grantor and takes subject to any defenses available against his grantor. Such a grantee is not a *bona fide* purchaser within the meaning of the recording statutes. Snow v. Lake, 20 Fla. 626; Fries v. Griffin, 35 Fla. 212; 17 So. R. 66; Oliver v. Piatt, 3 How (U. S.) 333; 11 L. Ed. 622; Warvelle, Vendors, Sec. 613; 27 R. C. L. 731 et seq.

An assignee who purchases from his assignor only an equitable title, takes it with all its imperfections and subject to all prior equities, notwithstanding a valuable consideration may have been paid for the assignment of the equitable interest, and there may have been no notice of such prior outstanding equity. The fact that the legal title is not in his assignor is notice that he is buying an inchoate title imperfect on its face. The assignee therefore takes only what his assignor can convey, or that which his assignor can call upon a court of equity to require the holder of the legal title to convey to him. 39 Cyc. 1667. In the absence of estoppel, such assignee, since he has not the legal title, and is therefore not protected as a *bona fide* purchaser, takes subject to all counteravailing equities to which it was subject in the hands of his assignor. The fact that a valuable consideration has been paid for the assignment of the equitable interest, and the fact of the assignee not

having notice of a prior equity, do not in and of themselves entitle the assignee of such equitable interest to take precedence over a prior vendee; some further equitable quality imparting to the assignee's estate or interest an intrinsic superiority is necessary to give him a, precedence over a prior vendee. Boone v. Chiles, 10 Pet. (U. S.) 177; 9 L. Ed. 388; Shirras v. Craig, 7 Cranch (U. S.) 34, 38; 3 L. Ed. 260; Pomeroy Eq. Jur. 683; Bruschke v. Wright, 46 N. E. R. 813; 57 Am. St. R. 125; Deskins v. Big Sandy Co., 89 S. W. R. 695. Cobb and Cambron therefore did not become *bona fide* purchasers by virtue of the quit claim deed from Belk and Cunningham.

The situation therefore becomes in effect a contest between claimants of conflicting equities, and it must be determined which equity should prevail.

Down to the point where Cobb and Cambron acquired the equitable rights of Belk and Cunningham through delivery of the quit-claim deed, and leaving out of consideration for the moment the warranty deed from Myers, it would seem probable that, as between the conflicting equitable rights of Van Buskirk on the one hand and of Cobb and Cambron as assignees of Belk and Cunningham on the other, Van Buskirk's equity would prevail, upon the doctrine that as between persons having equitable interests only, none of them having a legal title, if their interests are in all other respects equal, he has the better equity who is prior in point of time. Johnson v. Hayward, 12 Ann. Ca. 800; 21 C. J. 209; Pomeroy Eq. Jur., Sec. 683, 691.

There still remains to be considered, however, what influence upon the priorities between these equities is had by the fact that Cobb and Cambron, in addition to having acquired the equitable title of Belk and Cunningham, also acquired without fraud or undue negligence the legal title from Myers. In determining that question, the fact that

Cobb and Cambron have united the legal and equitable titles in themselves is by no means without significance, even though Cobb and Cambron did not acquire the legal title under such circumstances as to afford them protection as *bona fide* purchasers. In determining the question of priority between conflicting equities, it is also an established doctrine that where the equities are otherwise equal, the one who has obtained, without fraud or undue negligence, the legal title and has united it with his equitable interest will prevail. Pomeroy, Eq. Jur., Sec. 416. The latter doctrine frequently alters the effect of the doctrine of priority according to time just above referred to, because in a contest between persons having only equitable interests, priority of time is the ground of preference last resorted to; that is to say, a court of equity will not prefer the one to the other on the sole ground of priority of time until it finds on examination of their relative merits that that is the only sufficient grounds of preference between them; and if the one has on different grounds a better equity than the other, priority of time is usually, if not always, subordinated to other equitable considerations. In other words, as between persons holding only equitable interests, priority in time gives the better equity only when their equities are otherwise of equal merit. Frost v. Wolf, 14 So. W. R. 440; 19 Am. St. R. 761; 10 R. C. L. 385, 386. If one, in addition to an equal equity, has also the legal title he will usually prevail, irrespective of the element of time. 21 C. J. 207, *et seq;* Newton v. McLean, 41 Barb. (N. Y.) 285.

In considering this phase of the matter, it should be remembered that Van Buskirk has never held more than an equitable title. Belk and Cunningham acquired an equity of like character, which, however, was subsequent in point of time to Van Buskirk's equity. It does not appear that Belk and Cunningham ever had notice, either actual or

constructive, of the prior Van Buskirk equity. When Cobb and Cambron on October 31, 1925, acquired the equitable rights of Belk and Cunningham and paid them $5,000.00 in cash therefor, and when on the same date Cobb and Cambron acquired the legal title from Myers, Cobb and Cambron had no notice, actual or constructive, of the Van Buskirk contract, nor did they receive such notice prior to November 19, 1925. There is no intimation that Cobb and Cambron practiced any fraud in procuring the legal title from Myers, nor does there appear any other ground of estoppel against Cobb and Cambron. Although Cobb and Cambron did not pay the consideration for the legal title under such circumstances as to entitle them to protection as *bona fide* holders, the conveyance of such legal title was not gratuitous or voluntary, but was upon a valuable consideration, the actual payment of which was deferred by agreement of the parties for the time being.

The rule for determining priority in the circumstances here involved is tersely and correctly stated by Pomeroy to be: ''That if a second or other subsequent holder (of an equity), who would otherwise be postponed to the earlier ones, obtains the legal estate, or acquired the best right to call for the legal estate, he thereby secures an advantage which entitles him to priority. It is absolutely essential, however, that he should have acquired his *equitable* interest without any notice of the prior claims, and that his subsequent procurement of the legal estate should be free from fraud and from undue negligence.'' Pomeroy, Eq. Jur. 727. Of course, the subsequent equitable interest must be completely acquired, and a valuable consideration must have been actually paid therefor, both without notice of the prior equity, in order that the holder of the equity later in time may secure priority through acquisition of the legal estate. Pomeroy, Eq. Jur., Sec.

729. The situation of Cobb and Cambron accords with these requirements.

The same rule is thus stated by another eminent author: "In order to avoid the postponement of the later equity, freedom from notice is indispensable. The notice, however, here referred to is a notice existing at the acquirement of the equity, not a notice at the completion of the right. The latter purchaser or encumbrancer, on payment of his money, becomes an honest claimant in equity, and is entitled, if he can, to protect his claim. But he is not bound to look for protection until he has ascertained that danger exists; and his right to obtain it will continue notwithstanding the institution of a suit to settle the priorities of the conflicting claimants." Adams Eq. Sec. 161, 162.

As is further said by Pomeroy, the most usual example of the rule just discussed will be instances of *bona fide* purchasers for a valuable consideration, and will be governed by the doctrine on that subject; but the rule does not require such a state of facts. In other words, the rule does not require that the one who protects himself by acquiring the legal title should be in all respects a *bona fide* purchaser of that estate for a valuable consideration and without notice. The rights of mere priority between claimants of conflicting equities and the rights of *bona fide* purchaser are by no means identical, and different principles control the two situations. Boone v. Chiles, *supra;* Campbell v. Breckenridge, 8 Blackf. (Ind.) 471; Dedeaux v. Cuevas, (Miss.) 64 So. R. 7; Dueber Watch Case Mfg. Co. v. Daugherty, 57 N. E. R. 455; Coleman v. Rives, 24 Miss. 634; Pomeroy, Specl. Perf., Sec. 464; 21 C. J. 207; Judson v. Cocoran, 19 L. ed. 231; McAllister v. Clark, 217 Pac. R. 178; Strauss v. Woeffel, 131 N. E. R. 64; Frink v. Commercial Bank, 191 N. W. R. 513; Benson v. Saffert, Etc. Co., 198 N. W. R. 297.

The rule under consideration is thus stated in Newton v. McLean, 41 Barb. (N. Y.) 285; ''The rule in equity is that as between two parties having equal equities, the prior equity must prevail; but if the party having the subsequent equity clothes himself with the legal title before he has notice of the prior equity, such legal title must prevail.'' There is also strong authority to the effect that one who has acquired an equity without notice of a prior adverse equity may protect himself by acquiring the legal title even after notice of the prior equity. Pomeroy, Eq. Jur., Sec. 729. Compare 10, R. C. L. 387. It is unnecessary, however, to now decide the latter phase of the rule as Cobb and Cambron acquired the legal as well as an equitable title before notice of Van Buskirk's equity.

Under the facts in this case, Cobb and Cambron seem to be clearly within the rule of priority just discussed. When they acquired the equitable title of Belk and Cunningham on October 31, 1925, and paid a cash consideration of $5,000.00 therefor, they had no notice, actual or constructive, of the existence of Van Buskirk's equity, nor had they any notice thereof when on the same date they acquired the legal title from Myers. Having no notice of the Van Buskirk equity, Cobb and Cambron were entitled to protect their own equity, innocently acquired upon a valuable consideration, by taking the legal title from Myers. The acquisition by Cobb and Cambron of the legal title, in addition to their equitable title, under the circumstances, gives them an unquestioned priority over Van Buskirk, whose equity, so far as Cobb and Cambron and their assignors are concerned, was latent until November 19, 1925, and who could have protected himself against the very contingencies which later arose by the simple

expedient of promptly recording his contract in the public records.

The decree appealed from is reversed.

Ellis, C. J., and Whitfield, Terrell, Brown and Buford, J. J., concur.